**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

—————————————————————
:
SECURITIES AND EXCHANGE                 :
      COMMISSION,                           :
                               :
                 Plaintiff,           :     CIVIL ACTION NO. 05-3905 (JAP)
                               :
        v.                                  :
                               :     **OPINION**
KENNETH D. PASTERNAK and                 :
      JOHN P. LEIGHTON,                     :
                               :
               Defendants.          :
—————————————————————:

APPEARANCES:

Jane M.E. Peterson, Esq.
William H. Kuehnle, Esq.
Donald N. Dowie, Esq.
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549-4010
    *Attorneys for Plaintiff, the Securities and Exchange Commission*

Howard Schiffman, Esq.
James M. Wines, Esq.
Christopher M. McLean, Esq.
Dickstein Shapiro LLP
1825 Eye Street NW
Washington, D.C. 20006-5403
    *Attorneys for Defendant, Kenneth D. Pasternak*

Joel E. Davidson, Esq.
Davidson & Grannum, LLP
239 Old Tappan Road
Old Tappan, New Jersey 07675
    *Attorney for Defendant, John P. Leighton*

PISANO, District Judge.

## TABLE OF CONTENTS

I.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-
       A.    Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-
       B.    Witnesses Presented at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -7-
       C.    Credibility Determinations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -20-

II.    STATUTORY AND REGULATORY BACKGROUND. . . . . . . . . . . . . . . . . . .  -23-
       A.    Applicable Statutes under the Securities Act and the Exchange Act. . . . . . . .  -23-
       B.    Applicable NASD Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -27-

III.   FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -31-
       A.    Background of the NASDAQ Market in 1999-2000 and Formation of Knight
             Securities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -31-
       B.    Knight's Execution of Trades and Retail Order Flow. . . . . . . . . . . . . . . . . .  -39-
             1.     Institutional Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -39-
             2.     Retail Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -43-
             3.     Sales Credit Data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -45-
       C.    Knight's Supervisory and Compliance Structures. . . . . . . . . . . . . . . . . . . . .  -46-
       D.    Joseph Leighton's Trading Practices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -50-
       E.    The Leightons' Departure from Knight. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -59-

IV.    CONCLUSIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -63-
       A.    SEC's Burden of Proof and Requisite Elements. . . . . . . . . . . . . . . . . . . . . . .  -63-
             1.     Primary Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -64-
             2.     Secondary Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -68-
       B.    Underlying Securities Fraud by Joseph. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -74-
             1.     Excessive Profits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -74-
             2.     Failure to Disclose Mark-Ups. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -77-
             3.     Front-Running. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -80-
             4.     Improper Use of ACT Modifiers. . . . . . . . . . . . . . . . . . . . . . . . . . . .  -85-
             5.     Joseph Did Not Violate a Securities Law. . . . . . . . . . . . . . . . . . . . . .  -86-
       C.    Primary Liability Against Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -87-
             1.     Affirmative Misrepresentations. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -88-
             2.     Failure to Disclose. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -90-
             3.     Defendants Did Not Violate a Securities Law. . . . . . . . . . . . . . . . . . .  -93-
       D.    Aiding and Abetting and Control Liability Against Defendants. . . . . . . . . . . .  -93-
             1.     Aiding and Abetting Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -94-
             2.     Control Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -96-

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -99-

This matter comes before the Court upon an Amended Complaint brought by Plaintiff Securities and Exchange Commission ("SEC") against Defendants Kenneth D. Pasternak ("Pasternak") and John P. Leighton ("John") (collectively, "Defendants"). The SEC alleges that Defendants, as supervisors and senior executives of Knight Securities, L.P. ("Knight"), a registered broker-dealer firm, violated certain provisions of the Securities Act of 1933 ("the Securities Act") and the Securities Exchange Act of 1934 ("the Exchange Act").

From May 13, 2008 to June 2, 2008, the Court conducted a non-jury trial. After the SEC rested its case, on May 30, 2008, Defendants moved for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). The SEC opposed the motion. The Court reserved decision on the motions and heard additional arguments on the issue on June 12, 2008. After careful consideration of the extensive record before it, the Court sets forth herein its findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), and finds in favor of Defendants.[1]

I.      **BACKGROUND**

   A.      **Procedural History**

This case inquires into Knight's "market making" business and the actions of one of Knight's institutional sales traders, Joseph Leighton ("Joseph")—John's brother. In particular, the SEC focused its claims on forty-two trades executed by Joseph in 1999 and 2000 on behalf of "buy-side" institutional firms, such as mutual funds and investment advisors. All of the

---

[1] The Court addresses the entirety of the action on its merits. As a result, the Court dismisses as moot Defendants' motions for a judgment on partial findings.

complained-of trades occurred in the NASDAQ Stock Market ("NASDAQ").  During the

relevant time period, John, as head of Knight's institutional sales desk, supervised Joseph, while

Pasternak held ultimate supervisory responsibilities as Knight's CEO and Chairperson of the

Board of Directors.

Based on Defendants' status as supervisors at Knight, and John's familial relationship

with Joseph, the SEC, on August 8, 2005, filed a complaint, which they subsequently amended

on March 30, 2006.  The Amended Complaint asserts five counts against Defendants.  In Count

I, the SEC alleges that Defendants aided and abetted "Knight's violation of Section 10(b) of the .

. . Exchange Act . . . and Rule 10b-5 thereunder[.]"  (Amended Complaint ("Am. Cmplt.") ¶¶ 72-

74 (citing 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5)).  In Count II, the SEC asserts that

Defendants violated Section 17(a) of the Securities Act.  (Am. Cmplt. ¶¶ 75-77 (citing 15 U.S.C.

§ 77q(a))).  In Count III, the SEC alleges that Defendants aided and abetted Knight's violation of

Section 15(c)(1)(A) of the Exchange Act.  (Am. Cmplt. ¶¶ 78-81 (citing 15 U.S.C. §

78o(c)(1)(A))).  In Count IV, the SEC claims that Defendants aided and abetted Knight's

violations of Section 17(a) of the Exchange Act and Rule 17a-3 thereunder.  (Am. Cmplt. ¶¶ 82-

85 (citing 15 U.S.C. § 78q(a); 17 C.F.R. § 240.17a-3)).  Finally, the SEC alleges in Count V that

Pasternak is jointly and severally liable, pursuant to the "control person liability" set forth in

Section 20(a) of the Exchange Act, for Knight's violations of Sections 15(c)(1)(A) and 17(a) of

the Exchange Act, as well as Rule 17a-3.  (Am. Cmplt. ¶¶ 86-87 (citing 15 U.S.C. §§ 78o(c)(1),

78q(a), 78t(a); 17 C.F.R. § 240.17a-3)).

Throughout the trial, the SEC offered varying theories of liability.  In the Amended

Complaint, the SEC alleges:

> Joseph Leighton, Knight's most prolific sales trader, engaged in a pattern of fraud by trading for Knight's institutional customers using a method that concealed from the customer the manner in which not held orders were worked, including the use of a delayed execution scheme and the improper use of ACT [(Automated Confirmation Transaction Service) ("ACT")] modifiers, which obscured the quality of the execution price, resulting in profits above the industry norm at effectively no risk to Knight.

(Am. Cmplt. ¶ 18).  As a result, the SEC submits that "Joseph Leighton failed to make full and appropriate disclosures and failed to provide best execution for orders placed by the institutional customers." (Am. Cmplt. ¶ 18).  During the trial, the SEC expressed that this pattern of fraud amounted to improper front-running; that is, Joseph, upon receipt of an institutional order, would take a position in the ordered security and delay the execution of the order to take advantage of fluctuating market conditions, thereby generating profits that the SEC deems improper.  (Trial Transcript ("Tr.") 487:15-493:3).

The SEC further alleges that Defendants knew of, or were reckless in not knowing of, Joseph's fraud.  (Am. Cmplt. ¶ 46).  The Commission claims Defendants participated in the perpetration of this fraud by misstating to Knight's customers and the public that Knight provided "best execution" and failing to disclose "the manner in which [Joseph] priced executions to customers." (Am. Cmplt. ¶ 47).  During the trial, the SEC explained that John and Pasternak owed an independent fiduciary obligation to disclose to Knight's institutional customers Joseph's profits, and the failure to so inform the customers breached their fiduciary duties.  The SEC further argued that Pasternak made a false and misleading statement by signing Knight's 1999 and 2000 Form 10-Ks, which stated that Knight provided its customers with best execution.  Finally, the SEC alleges that institutional sales traders at Knight, including Joseph, misused ACT modifiers, causing inaccurate and untimely reporting of trades to NASDAQ, and

that Defendants knew of this systematic misuse.  (Am. Cmplt. ¶¶ 66-70).

Based on those allegations, the SEC seeks injunctive relief, as well as statutory damages and disgorgement.  Specifically, in the form of injunctive relief, the SEC requests that the Court permanently enjoin Defendants from future violations of the Securities Act and the Exchange Act, from aiding and abetting any future violations of the Exchange Act, and "from controlling any person that is in a position to violate Exchange Act Sections 15(c)(1)(A) and 17(a) and Exchange Act Rule 17a-3[.]"  (Am. Cmplt. ¶¶ (I)-(III)).

During a fifteen-day bench trial, the Court provided both parties with the opportunity to present evidence.  The SEC proffered the following witnesses from Knight:  Gregory Cavallo, Carmine Curra, Thomas Fedele, David Miller, Anthony Mitrano, Kenneth Ackerman, Alan Levinson, John Hewitt, John Howard, and Pasternak.  The Commission also proffered the following fact witnesses representative of Knight's customers: Andrew Brooks, Robert Marcotte, William Lawlor, Stuart George, Scott Thornton, William Schubert, Francine Smith, Kurt Smith, Margaret Mace, and William Perry.  The SEC offered as a summary witness, Stephen P. Glascoe, in addition to the testimony of three experts: James Cangiano, Richard Gunter, and Daniel Levy, Ph.D.  However, on May 23, 2008, upon Defendants' motion *in limine*, the Court found that Richard Gunter could not properly testify as an expert in the field of "market making and institutional trading."  As a result, the Court precluded Gunter's testimony.  In response, Defendants presented in their case-in-chief the testimony of one witness:  Leonard Amoruso, Knight's Global Chief Compliance Officer at the time Joseph allegedly engaged in the fraudulent behavior.

At the close of the SEC's case, on May 30, 2008, Defendants moved for a judgment on

partial findings pursuant to Federal Rule of Civil Procedure 52(c).  Defendants argued that the

SEC failed to establish a fraud committed by Defendants for which they would be primarily

liable, an underlying fraud committed by Joseph, or, even assuming that Joseph committed

securities fraud, that Defendants are secondarily liable for any alleged violation.  Defendants

underscore that the SEC did not establish any supervisory standards by which the fact-finder

could gauge Defendants' conduct.  The SEC opposed the motion, contending that it proffered

sufficient proofs for the Court to find in its favor.  After receiving briefing on the issue and

hearing extensive arguments placed on the record on June 2, 2008, the Court reserved decision

on the motion.  Because the Court now addresses the entirety of the action on its merits,

Defendants' motions are moot.

### B.     Witnesses Presented at Trial

The SEC proffered the following factual witness who worked for Knight during the

relevant time period: Gregory Cavallo ("Cavallo"); Carmine Curra ("Curra"); Thomas Fedele

("Fedele"); David Miller ("Miller"); Anthony Mitrano ("Mitrano"); Kenneth Ackerman

("Ackerman"); Alan Levinson ("Levinson"); John Howard ("Howard"); John Hewitt ("Hewitt");

and Pasternak.

Cavallo, who was a sales trader at Knight during the relevant time frame, testified on May

14 and 15, 2008.  (Tr. 438:6-633:20).  He averred as to the function of a sales trader at Knight,

(Tr. 441:19-24), the setting and manner in which the sales traders worked, (Tr. 444:2-446:6,

448:19-449:20), and the management structure of Knight's institutional sales desk, (Tr. 446:8-

448:17, 479:1-480:6, 474:18-477:6).  Specifically, Cavallo testified as to his obligations as a

sales trader working an institutional not-held order and how he fulfilled those obligations.  (Tr.

450:20-473:3, 545:10-549:25, 568:17-583:18, 587:10-594:4).  He also stated that Knight

compensated sales traders based on a percentage of the profit or loss for a particular trade—an

allocation negotiated between the sales trader and the market maker for that trade.  (Tr. 473:4-

474:13, 524:24-528:14, 556:6-568:15, 583:19-587:8).  Finally, Cavallo discussed his recollection

of Joseph's trade of Costco (COST:NASDAQ) ("COST") shares that generated a large "profit

and loss" number ("P&L") on the computer program employed by Knight, the Brokerage Real

Time Application Support System ("BRASS").  (Tr. 482:4-486:24, 528:18-535:1, 596:22-

600:15, 603:12-608:9).

Curra was also a sales trader at Knight during the relevant time period of 1999 to 2000.

He testified on May 19 and 20, 2008.  (Tr. 1002:11-1022:14, 1050:3-1069:22).  Curra testified as

to the general practices of a Knight sales trader in executing trades on behalf of institutional

customers.  (Tr. 1008:4-1021:17, 1065:8-1067:17, 1068:2-20).  Notably, Curra averred that

Knight's "substantial retail order flow" could affect an order handled by a sales trader.  (Tr.

1061:5-25).  Curra also discussed the supervision of sales traders and compliance procedures in

effect during his tenure at Knight.  (Tr. 1007:20-1008:3, 1062:1-1064:2).

Another testifying sales trader was Fedele, who testified on May 20, 2008.  (Tr. 1181:20-

1231:25).  Similar to Cavallo and Curra, Fedele described the atmosphere of Knight's

institutional sales desk, (Tr. 1185:19-1187:2), and testified as to his obligations as a sales trader,

(Tr. 1183:12-15), and how he would fulfill those obligations, (Tr. 1183:16-1185:18).  He also

testified as to how he received and handled institutional not-held orders, (Tr. 1191:17-1203:8,

1214:17-1221:17), and the complexity of working those orders as the market maker handled

retail order flow, (Tr. 1205:8-1210:4).  In addition, Fedele discussed the manner in which sales

traders were supervised, including John's role as manager of the sales desk.  (Tr. 1187:3-1191:16, 1210:6-1214:15).  Finally, he explained how Knight compensated its sales traders.  (Tr. 1203:9-1204:15, 1223:18-1228:22, 1229:3-1230:17).

To describe the manner in which sales traders in general and Joseph in particular worked an order, the SEC proffered the testimony of Miller and Mitrano, who both served as assistants to Joseph and John.  The SEC provided Miller's testimony on May 16, 2008, (Tr. 818:9-25); (Exhibit 1106), and Mitrano's testimony on May 20, 2008, (Tr. 1173:11-15); (Exhibit 1111).  Miller testified as to John's supervision of the sales desk and interactions with his brother, Joseph.  (Exhibit 1106 at 16-17, 21-24, 64-65, 68-69, 73-75, 145-48, 150-53).  Miller also described the contents of an order ticket and his responsibilities as an assistant in respect of handling an institutional order.  (Exhibit 1106 at 45-51, 55-59, 69-70, 72-73, 75-86, 88, 99-106, 112, 114-15, 124-45, 154-60).  Miller further detailed Knight's method for calculating a sales trader's compensation on a particular trade.  (Exhibit 1106 at 112-14, 116-19).

Mitrano testified in accordance with Miller's testimony, discussing his role as an assistant on the institutional sales desk, including how he completed order tickets, handled orders, and printed shares for Joseph.  (Exhibit 1111 at 16-19, 23-33, 40-41, 44-49, 52-53, 55-57, 64, 67-68, 71-72, 75-82, 88-93).  Mitrano also explained how he calculated a profit and loss calculation on a particular trade.  (Exhibit 1111 at 60-63, 66-67).

The SEC provided the Court with testimony from two market makers at Knight: Ackerman and Levinson.  The Court heard Ackerman's testimony on May 16, 2008.  (Tr. 837:4-8); (Exhibit 1108).  Ackerman, Knight's trading room manager and market maker, testified as to the function of a Knight market maker, the tools he used to operate, and Pasternak's oversight of

the market making desk.  (Exhibit 1108 at 13-17, 26-31, 33-38, 40-45).  In addition, Ackerman

detailed Knight's system of handling retail order flow and how such orders could affect the

execution of an institutional order.  (Exhibit 1108 at 23-25, 31-33).  Finally, Ackerman averred

as to his interactions with Joseph and his knowledge of Joseph's trading practices.  (Exhibit 1108

at 38-39, 47-49).

     Levinson, a market maker who testified on May 23, 2008, (Tr. 1650:20-1735:8),

described the setting of Knight's market making desk, (Tr. 1657:19-1658:15), including

managerial supervision of the desk, (Tr. 1661:3-1664:6, 1714:4-1716:2, 1725:5-1726:12), and

defined the role of a market maker, (Tr. 1658:16-1659:13).  Levinson explained how a market

maker would handle an institutional not-held order supplied by a sales trader, including

determining the price of a stock given to the customer.  (Tr. 1659:14-1661:1, 1664:19-1687:23,

1706:24-1712:5).  He also described how Knight handled retail order flow and automatic

executions, (Tr. 1670:1-1673:9, 1721:18-1724:9), as well as the process for calculating sales

credits and determining a sales trader's compensation, (Tr. 1716:3-1718:7).  Finally, Levinson

detailed his handling of a trade of E-Tek Dynamics (ETEK:NASDAQ) ("ETEK") stock brought

to him by Joseph.  (Tr. 1688:23-1703:15).

     On May 20, 2008, the Court heard the testimony of Howard, Knight's controller during

the relevant time period of 1999-2000.  (Tr. 1071:2-1144:25); (Exhibit 36 at KN 1280).  Howard

testified as to his responsibilities and duties as a controller, (Tr. 1072:23-1073:10), and described

various documents produced by the accounting department relating to the profits generated by

Knight's sales traders, (Tr. 1073:14-1116:10, 1125:21-1138:21, 1143:9-1144:21).  He also

discussed how Knight calculated sales credit data for each sales trader.  (Tr. 1075:23-1082:14,

1084:10-1085:8, 1117:2-1121:4, 1123:25-1124:16, 1138:23-1140:24, 1141:5-24).  Howard

averred that the information the accounting department used to generate its reports and the

reports themselves were available to market makers, sales traders, and members of the executive

committee at Knight.  (Tr. 1120:3-16).

The SEC proffered the testimony of Hewitt, Knight's President and Director from mid-

1999 until mid-2001, on May 21, 2008.  (Tr. 1264:11-1462:3).  Hewitt detailed his role at Knight

as President.  (Tr. 1275:2-1279:12).  Specifically, Hewitt testified as to his lack of understanding

in respect of how John and Joseph generated profits for Knight and his belief, based on his

incomprehension, in addition to a phone call from a trader outside of Knight, (Tr. 1287:25-

1288:13), that the brothers were engaged in a form of front-running.  (Tr. 1279:13-1282:14).

Hewitt averred that he informed Pasternak, the Board of Directors, and Knight's general counsel

of his concern, (Tr. 1282:15-1285:16, 1295:13-1296:19), and that, in response, Pasternak agreed

to permit Hewitt to hire someone to replace John as head of the institutional sales desk, (Tr.

1285:20-1286:6).  Hewitt further testified that he did in fact hire Robert Stellato ("Stellato") for

that position, (Tr. 1289:4-1290:1), and that one of Stellato's assignments was to determine how

Joseph executed his trades, (Tr. 1290:3-1291:13).  Hewitt also detailed the events leading to the

Leightons' departure from Knight.  (Tr. 1292:13-1294:16).

On May 27 and 28, 2008, the Court heard testimony from Pasternak.  (Tr. 1773:19-

2076:21).  Pasternak was the Chief Executive Officer ("CEO"), President, and Chairman of the

Board of Directors of Knight Trimark Group, Knight's parent company, during 1999 to 2000.

(Tr. 1775:24-1778:6).  Until some time before August 7, 2000, Pasternak also served as a

supervisor of the market making desk.  (Tr. 1778:19-1779:6, 1781:4-17).  Pasternak described

-11-

Knight's formation and general business model.  (Tr. 1980:14-1986:22).

Pasternak also testified as to his duties and responsibilities at Knight, including the amount of time he spent at the market making desk and his limited role in executing institutional orders.  (Tr. 1785:15- 1793:3).  He discussed his knowledge of Joseph's sales credits and profits, (Tr. 1794:1-1800:1, 1805:21-1808:24, 1813:1-1814:1, 1998:21-2000:1), in addition to his review and understanding of Joseph's trading practice, (Tr. 1800:13-1801:20, 1814:2-13, 1867:18-1870:15).  Pasternak testified as to his method for spot-checking certain trades.  (Tr. 1801:21-1805:20).  Significantly, Pasternak averred as to Knight's practices for generating P&L numbers, (Tr. 1806:20-1812:25, 1840:24-1841:22, 1902:13-1903:14), calculating compensation, (Tr. 1875:12-1889:10), and general trading practices, (Tr. 1829:11-1831:23, 1966:4-1968:22, 2000:2-2004:3, 2033:3-2036:7, 2053:5-2057:16, 2058:5-2061:2).

In his testimony, Pasternak stated that, in 1999 and 2000, he believed that Knight's profits caused a potential "marketing problem," and he explained how he reacted to Hewitt's belief that the Leightons engaged in front-running.  (Tr. 1842:4-1859:24, 1861:18-1864:6, 2004:12-2008:2, 2009:23-2017:3).  Pasternak recounted his efforts to determine whether Joseph's trading practice was illegal in light of Hewitt's concerns.  (Tr. 1848:22-1867:17, 1870:16-1871:21, 1911:19-1931:3, 1963:11-1966:2, 1968:24-1977:12, 2017:5-2022:17).  Finally, Pasternak described the circumstances surrounding the departure of the Leightons from Knight.  (Tr. 2023:5-2027:20, 2036:9-2039:1, 2047:23-2051:14).

The SEC also proffered extensive testimony from Knight's institutional customers: Andrew Brooks ("Brooks"); William Lawlor ("Lawlor"); Stuart George ("George"); Scott Thornton ("Thornton"); William Schubert ("Schubert"); Kurt Smith ("K. Smith"); Francine

Smith ("F. Smith"); Margaret Mace ("Mace"); Robert Marcotte ("Marcotte"); and William Perry ("Perry").

Brooks, the Head of the U.S. Equity Trading Desk at T. Rowe Price Group, Inc. ("T. Rowe"), testified on May 13 and 14, 2008.  (Tr. 45:1-298:19).  He testified as to the nature of his employer's business, how "buy-side" firms operated, and what his business expected from broker-dealers like Knight.  (Tr. 49:10-104:22, 115:24-117:3, 134:13-25, 138:22-144:17, 149:1-152:21, 154:11-155:4, 165:4-169:7, 204:24-210:9, 212:12-221:14, 283:16-289:20, 290:19-295:4).  Brooks also provided a foundational background to much of the terminology employed throughout the trial, as well as general information in respect of the NASDAQ market.  (Tr. 66:14-67:9, 69:18-71:15, 88:1-90:13, 96:24-97:9, 99:6-18, 105:15-110:6, 130:12-134:12, 135:2-136:4, 155:5-165:2).  In addition, Brooks discussed the relationship between T. Rowe and Knight in 1999 to 2000.  (Tr. 104:23-105:10, 110:8-125:14, 136:14-138:21, 144:19-148:25, 169:9-181:14, 184:1-200:13, 201:10-208:21, 221:15-235:2, 269:17-283:11, 298:3-15).

On May 14, 2008, Lawlor, Manager and Vice-President of Equity Trading at Davis Selected Advisors ("Davis Selected"), testified.  (Tr. 301:4-383:10, 389:2-4).  Lawlor described his responsibilities and obligations as manager of the trading desk at the private mutual fund company.  (Tr. 301:14-304:7, 324:14-325:5).  He also testified as to his understanding of how not-held orders operated and his expectations in respect of the execution of those orders.  (Tr. 304:9-309:21, 313:18-314:11, 319:3-324:2, 327:24-329:24, 338:13-339:18, 359:2-363:7, 365:22-369:24, 375:21-382:23).  Lawlor further enunciated the manner in which traders at Davis Selected traded in general, (Tr. 309:23-310:11, 315:20-316:19), and Davis Selected's relationship with Knight, (Tr. 310:13-313:21, 316:20-318:17, 339:19-343:10, 346:4-351:1,

-13-

370:1-374:22).  Specifically, Lawlor discussed a trade of COST shares executed by Knight.  (Tr. 314:12-315:19, 326:2-327:21, 329:25-338:4, 351:2-356:10).

George also testified on May 14, 2008.  (Tr. 397:10-437:24).  George, the Senior Vice-President of Equity Trading at Delaware Investments ("Delaware") during the relevant time frame, testified similar to the other buy-side customers.  He described the not-held order, how Delaware sought the execution of those orders, and his expectations in respect of the execution.  (Tr. 399:22-405:23, 410:20-411:5, 416:19-423:18, 426:10-428:13, 429:14-430:2, 431:9-437:21).  George also averred as to his interactions with, and orders executed by, Knight.  (Tr. 405:24-410:13, 411:2-414:10, 414:24-416:18, 423:19-426:9, 428:14-429:12, 430:3-431:1).

On May 16, 2008, the SEC proffered the testimony of Thornton, (Tr. 767:8-19); (Exhibit 1103), Schubert, (Tr. 777:8-12, 778:3-4); (Exhibit 1104), and K. Smith, (Tr. 803:17-22); (Exhibit 1105).  Thornton, during the relevant time period, was Portfolio Manager and Vice-President of Dimensional Fund Advisors ("Dimensional"), one of Knight's customers.  (Exhibit 1103 at 13-14).  In his testimony, Thornton described his employer's business, including how Dimensional placed its orders.  (Exhibit 1103 at 15-18, 23-32, 43-48, 52-56, 59-65, 68-73, 76, 87-93, 95-96).

Schubert, Managing Director, Head of Equity Trading at Trust Company of the West ("Trust"), another Knight customer, testified similar to Thornton.  (Exhibit 1104 at 17, 21).  Schubert described the manner in which his company sought the execution of trades with firms like Knight and discussed his expectations in respect of those trades.  (Exhibit 1104 at 35-37, 43-44, 46-47, 49-50, 75-77, 85-92, 108, 119-21, 123-27, 177-89).  He also testified as to his personal trading experiences with Knight.  (Exhibit 1104 at 63-65, 73-74, 78-82, 117, 128-29, 198-99, 202-03).

-14-

K. Smith, an equity trader with Fidelity Investments ("Fidelity"), testified in accordance with the other buy-side witnesses. He explained his role in executing fund managers' trades at Fidelity, (Exhibit 1105 at 9, 11-12), and how he chose a market maker to execute his trades, (Exhibit 1105 at 22-24). K. Smith also discussed how broker-dealers in general and Knight in particular executed his orders. (Exhibit 1105 at 28-30, 32-33, 37-44, 48-54, 71-82). In his testimony, he detailed his transaction with Joseph for a trade in Synopsys, Inc. (SNPS:NASDAQ) ("SNPS") shares on August 9, 2000. (Exhibit 1105 at 62-66, 82-90).

On May 22, 2008, the SEC offered the testimony of two additional buy-side witnesses: F. Smith, (Tr. 1617:6-11); (Exhibit 1113), and Mace, (Tr. 1613:18-23); (Exhibit 1112). F. Smith, Trader and Vice-President of Trust, testified as to her trading practices in 1999 and 2000. (Exhibit 1113 at 21-22, 32, 46-53, 58-60, 64-65, 67, 69-73, 78-81, 100-02, 107-09, 117-18). She also discussed her relationship Joseph and Knight. (Exhibit 1113 at 81-82, 85-86, 106-07, 109-10). Between 1999 and 2000, Mace was Head Trader at Pilgrim Baxter and Associates, Ltd. ("Pilgrim"). (Exhibit 1112 at 47). Mace testified in accordance with the other institutional customers, detailing her trading methodology and experiences with Knight. (Exhibit 1112 at 29-30, 36-38, 40-43, 51-52, 54-57, 72-73, 75-76, 83-84, 115-17, 127-28, 185-87, 190-91, 193-99, 210-14).

The Court also heard testimony from Marcotte, (Tr. 2285:18-22); (Exhibit 1117), on May 29, 2008, and Perry, (Tr. 2294:8-17; 2424:6); (Exhibit 1119), on May 30, 2008. Marcotte, an equity trader at T. Rowe, testified as to his trading practices and expectations from a broker-dealer executing his trades. (Exhibit 1117 at 30, 32-33, 36-37, 42-45, 52-66, 90-92, 94). He also provided testimony as to his transactions with Knight. (Exhibit 1117 at 51-52, 69-75, 85-86, 88,

-15-

92-93, 97-98, 102-07).

Perry was a trader at Putnam Investments ("Putnam") in 1999 and 2000.  (Exhibit 1119 at (1/17/2006) 56).  In his testimony, Perry explained the manner in which he traded on behalf of Putnam's customers, (Exhibit 1119 at (1/17/2006) 122, 128, 131-32, 134-35, 137-38, 195-96, 203, 213-16, 237-42, 248-52, 257-69, 272, 276-81, (1/19/2006) 6-8, 12-13, 15-16, 21-24, 26-27, 29-32, 135-36, 139, 143-44, 150-52), and discussed his trading with Knight, (Exhibit 1119 at (1/17/2006) 82, 102, 118-19, 125-26, 208, 210, 216-19, 231-37, 245-47, 252).  Specifically, he detailed his June 30, 2000 order with Knight to sell shares in Juniper Networks, Inc. (JNPR:NASDAQ) ("JNPR").  (Exhibit 1119 at (1/19/2006) 47-65, 69-95); (Exhibit 244); (Am. Cmplt. ¶ 53f).  Perry also described his buy order with Knight in Efficient Networks (EFNT:NASDAQ) ("EFNT") shares, (Exhibit 1119 at (1/19/2006) at 98); (Exhibit 395),[2] and his order with Knight in ETEK shares on March 16, 2000, (Exhibit 1119 at (1/1/9/2006) at 98-99); (Exhibit 391); (Am. Cmplt. ¶¶ 31-32).

The SEC also proffered a summary witness, Stephen P. Glascoe ("Glascoe"), to introduce into evidence certain calculations.  The Court heard his testimony on May 20, 2008.  (Tr. 1145:23-1171:18); (Exhibits 531-39).  Glascoe is a market surveillance specialist in the SEC's enforcement division.  (Tr. 1146:1-9).  He generated spreadsheets listing Joseph's sales credit data for 1999 and 2000, as collected from Knight's records, and his calculations of Joseph's sales credit per share.  (Exhibits 531-33).  Glascoe then sorted the information by customer, date, and amount.

---

[2]  This trade was not included in the SEC's Amended Complaint as one of the forty-two allegedly fraudulent transactions executed by Joseph.

Exhibits 534, 535, and 536 set forth Glascoe's percentage calculations of Joseph's "payout from trades where the payout" per share equaled $0.25 or more, $0.50 or more, and $1.00 or more, respectively.  (Exhibits 534-36).  In Exhibit 537, Glascoe calculated Joseph's "profits in millions of dollars, by quarter for 1999 and 2000[.]"  (Exhibit 537).  In Exhibit 538, Glascoe calculated, for the period of 1999-2000, the "Percentage of Institutional Dep[artment] profits [and] share volume attributable to Joseph[.]"  (Exhibit 538).  Finally, in Exhibit 539, Glascoe compared Joseph's average profit per share with those of all other traders in Knight's institutional group for the period of 1999-2000.  (Tr. 1158:5-12); (Exhibit 539).

On May 15 and 19, 2008, the Court heard testimony from the SEC's expert witness, James Cangiano ("Cangiano").  (Tr. 637:2-720:24, 865:5-1001:23).  The SEC proffered Cangiano as an expert in the NASDAQ market and trading regulation, (Tr. 653:5-6), and the Court accepted Cangiano as an expert that field, (Tr. 670:6-20).  Cangiano described the NASDAQ market during the time frame of 1999-2000, (Tr. 670:23-672:10), and the function and obligations of a market maker, including the handling of not-held orders and supervisory obligations, (Tr. 671:24-684:18, 712:13-718:20, 943:12-956:14, 966:8-974:16, 995:13-999:9).  He also explained NASD-imposed regulations on market makers, such as the "best execution" requirement.  (Tr. 684:22-720:20, 883:11-910:12, 956:15-964:19).  In addition, Cangiano expressed his opinion as to Defendants' conduct, assuming the facts alleged in the SEC's Amended Complaint.  (Tr. 872:11-878:10, 880:18-883:10, 910:24-925:24, 928:24-941:24, 964:21-966:7, 975:5-978:17, 982:9-25, 986:21-995:12).

On May 22, 2008, the SEC sought to admit the testimony of Richard Gunter ("Gunter") as an expert in the field of "market making and institutional trading" to explain standards and

-17-

customs and to reconstruct Joseph's trades.  (Tr. 1497:23-1596:4-5).  However, exercising its

gate-keeping function, the Court found that *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579 (1993), precluded the admission of Gunter's testimony.  (Tr. 1606:6-1611:11); *S.E.C. v.

Pasternak*, 05-3905, Opinion (D.N.J. May 23, 2008).  Nevertheless, the Court briefly sets forth

here the substance of Gunter's expert report.  The Court notes that, had the Court admitted his

expert testimony and had he testified in accordance with his report, Gunter would have reiterated

much of the background information already provided via Cangiano's testimony.  Furthermore,

Gunter acknowledged that, although he "analyzed" Knight's data, that trade run data "speaks for

itself."  (Tr. 1561:16-18).

Gunter would have averred as to his review of seven trades executed by Knight.[3]  Based

on his review of the "trade runs," Gunter concluded, in his report, that Joseph engaged in front-

running, or interpositioning, whereby he would manipulate the printing of shares to a customer,

either delaying the print or printing using a modifier that indicated that the execution to the

customer occurred at an earlier point in time.  Thereby, according to Gunter, Joseph was able to

conceal his profits on the transaction.  Furthermore, Gunter would have testified that Defendants

must have known, or were reckless in not knowing, of Joseph's trading practices.

---

[3]  Those seven trades reviewed by Gunter are:  (1) a buy transaction of Applied Micro
Circuits Corporation (AMCC:NASDAQ) ("AMCC") shares executed on April 4, 2000 on behalf
of T. Rowe; (2) a buy transaction of EFNT shares executed on February 29, 2000 on behalf of
Putnam; (3) a sell transaction of ETEK shares executed on March 16, 2000 on behalf of Putnam;
(4) a sell transaction of JNPR shares executed on June 30, 2000 on behalf of Putnam; (5) a buy
transaction of Leap Wireless International, Inc. (LWIN:NASDAQ) ("LWIN") shares executed on
February 14, 2000 on behalf of Putnam; (6) a buy transaction of SNPS shares executed on
August 9, 2000 on behalf of Fidelity; and (7) a buy transaction of Tut Systems, Inc
(TUTS:NASDAQ) ("TUTS") shares executed on August 9 and 10, 2000 on behalf of Delaware
Advisors.  Significantly, the SEC did not include any allegations in its Amended Complaint in
respect of the EFNT, the LWIN, or the SNPS trades.

Finally, on May 28 and 29, 2008, the SEC offered the expert testimony of Daniel Levy, Ph.D. ("Dr. Levy"), an expert in the "analysis of markets and profit calculations and computing." (Tr. 2101:6-2131:20, 2175:22-2284:23).   On May 30, 2008, the Court accepted Dr. Levy's expert testimony.  (Tr. 2433:25-2435:13).  Dr. Levy testified as to his creation of "a program [used] to describe the trading patterns and the profits on a set of trades . . . from Knight[.]"  (Tr. 2106:18-20).  He described the method used to create that program, which included an allocating of shares to Knight's inventory for the purpose of executing an institutional order.  (Tr. 2118:1-2130:2, 2176:4-2182:13, 2184:9-2194:3).  Dr. Levy stated that the essence of his report was to calculate Joseph's profit on forty-six trades by subtracting the average price at which the shares were purchased from the price at which the shares were sold, for each trade.  (Tr. 2183:9-2184:8).[4]

In their case-in-chief, on May 30, 2008, Defendants offered the testimony of one witness: Leonard Amoruso ("Amoruso").  (Tr. 2322:17-2423:15).  Amoruso joined Knight in October 1999, as the chief compliance officer.  (Tr. 2326:12-21).  Amoruso testified as to the role of a compliance department generally, and of Knight's compliance department specifically.  (Tr. 2328:5-2330:12, 2332:21-2343:4, 2367:3-2382:21, 2390:24-2392:19).  He also discussed how he fulfilled his obligations as chief compliance officer.  (Tr. 2330:13-2332:19, 2343:5-22, 2359:10-2366:3).  Amoruso averred as to his understanding of rules and regulations regarding the execution of, and profits earned on, not-held orders.  (Tr. 2344:21-2348:18, 2382:22-2390:23, 2418:1-2420:8).  In addition, Amoruso explained Pasternak's support of the compliance

---

[4]  The product of Dr. Levy's calculations appear in Exhibits 108-10, 114-16, 119-21, 124-26, 129-31, 133-35, 138-40, 143-45, 149-51, 154-56, 163-65, 168-70, 172-74, 178-80, 183-85, 188-90, 193-95, 205-07, 215-17, 220-22, 225-27, 229-31, 235-37, 247-49, 252-54, 261-63, 265-67, 269-71, 274-76, 279-81, 284-86, 289-91, 295-97, 301-03, 306-08, 311-13, 316-18, 321-23, 326-28, 330-32, 335-37, 345-47, 356-58, 366-68, 371-73, and 376-78.

department.  (Tr. 2344:8-20).  Amoruso further detailed the steps taken after Stellato and Hewitt

raised concerns in respect of Joseph's trading practices, which included a review of three trades

of SNPS, JNPR, and TUTS shares executed by Joseph.  (Tr. 2350:1-2359:1, 2392:20-2417:20,

2420:14-2423:10).

###   C.   Credibility Determinations

Having had the opportunity to discern the demeanor of the witnesses, to hear their

testimonies, and to review extensively the transcripts of the trial, the Court finds the testimony of

all fact witnesses, in addition to the summary witness Glascoe, to be credible.  Indeed, all

witnesses appear to have testified truthfully and to the best of their recollections.

The Court underscores that it finds Pasternak's testimony to be credible.  His testimony

was corroborated by all witnesses and rebutted only by the SEC's conclusory allegations.

Indeed, Pasternak's testimony before the Court was his fifth opportunity in which he could attest

to the facts giving rise to the action.  Although the SEC attempted to impeach Pasternak with his

previous sworn testimony, the Court finds that no material inconsistencies exist between

Pasternak's statements.

Moreover, the Court rejects the SEC's argument that Pasternak's statement that he

believed Joseph's trading caused a "marketing problem" is an admission that Pasternak had

actual knowledge that Joseph engaged in fraudulent conduct.  Rather, the Court finds this

statement as establishing that Knight's profitability and success in a volatile period generated

"envy" among its corporate peers and had the potential to cause a perception that Knight, and

Joseph, engaged in improper or sharp business practices.  Such a belief and perception are

corroborated by the testimony of Levinson and Brooks, who averred, respectively, that Knight

was in "bubble" that caused it to be subject to stricter scrutiny and that Knight's peers envied and scrutinized Knight because of its profitability.  (Tr. 170:2-7, 1725:8-1726:12).

In respect of the expert testimony, the Court finds the testimony of Cangiano credible. The Court, however, reiterates its finding reached during the trial that Gunter could not properly testify as an expert in the field of "market making and institutional trading" for the purpose of explaining standards and customs or reconstructing Joseph's trades.

Moreover, in respect of Dr. Levy's testimony and proffered exhibits, the Court grants Dr. Levy's calculations and analysis limited weight.  Specifically, the Court finds that Dr. Levy's allocation of shares to Knight's inventory for the purpose of executing a particular institutional order, rather than for the purpose of executing retail orders—labeled in Dr. Levy's documents as "current order inventory," (Tr. 2186:15-22)—is undermined by Dr. Levy's reliance on Gunter for that process.  (Tr. 2218:21-2219:16).  In reviewing Knight's trading data, to separate "intervening" trades caused by Knight's retail order flow, Dr. Levy allocated shares acquired or sold by Knight's market maker immediately after receipt of an intervening trade to retail order flow and segregated any profit derived therefrom.  (Tr. 2187:19-2188:20).

However, Pasternak explained that it is "very difficult or virtually impossible" to determine "where the participation of the institution occurred in this continuum of low volume and price movements with all this retail interaction."  (Tr. 1809:23-1810:3, 1811:4-18).  In addition, Amoruso testified that, based on a review of Knight's trading records, it would be difficult to determine whether certain shares acquired or sold after receipt of an institutional order was actually allocated to that institutional order.  (Tr. 2401:18-2402:11).  For example, Amoruso specified that the accumulation of stock could be due to Knight's "buying from retail

sell orders . . . , as opposed to actually going out in the market and buying stock on behalf of that institutional order[.]"  (Tr. 2402:2-6, 2405:13-2406:7).  Ackerman, one of Knight's market makers, further explained that retail order flow would execute automatically to a certain point, but after reaching a threshold volume, the retail orders would enter a queue from which a market maker must manually execute the orders.  (Exhibit 1108 at 31-33).

Furthermore, Mitrano, who, as Joseph's assistant, would review trade runs on a daily basis to determine a profit and loss calculation, testified it was "extremely difficult" to distinguish between retail and institutional orders.  (Exhibit 1111 at 61:22-62:16).  In fact, Mitrano averred that there was no visual distinction between the two types of orders on the trade run data extracted from BRASS.  Thus, four witnesses with experience reviewing Knight trade data testified that (1) it is almost impossible to allocate shares between institutional orders and retail orders, (2) Knight's acquisition of a position of shares after receipt of an institutional order is not necessarily in response to an institutional order, but could be the result of executions for retail orders, and (3) not all retail orders would be executed immediately upon receipt of the order.

Importantly, Pasternak, Amoruso, Ackerman, and Mitrano had experience in handling voluminous retail order flow and reviewing trade run data reflecting such order flow.  In contrast, Gunter admittedly had no experience in handling any retail order flow, distinguishing retail order flow from institutional orders on a trade run, or determining how that order flow could affect executions of institutional orders.  As a result, the Court finds Pasternak, Amoruso, Ackerman, and Mitrano more credible than Gunter in their ascertainment of the difficulty in allocating shares between retail orders and institutional orders.  Because the testimony of Pasternak, Amoruso,

Ackerman, and Mitrano contradict Gunter's analysis of separating out retail order flow from Knight's trade run data, the Court finds Dr. Levy's reliance on Gunter for allocation of shares to determine an institutional order's inventory of shares undermines his ultimate calculation of the profitability of Joseph's trades.

## II.   STATUTORY AND REGULATORY BACKGROUND

The Court must consider this case against the backdrop of the complex and intricate statutory and regulatory body of law applicable to the securities industry.  For that reason, the Court sets forth at the outset the relevant statutes and regulations.  In addition, the Court details the rules and notices promulgated by the National Association of Securities Dealers, Inc. ("NASD") implicated by the SEC's allegations.[5]

### A.   Applicable Statutes under the Securities Act and the Exchange Act

The SEC's Amended Complaint seeks to impose primary and secondary liability for alleged violations of the following statutes and regulations: Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); Sections 10(b), 15(c)(1)(A), and 17(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(1)(A), and 78q(a)(1); and Rules 10b-5 and 17a-3, 17 C.F.R. §§ 240.10b and 240.17a-3(a).  Those statutes and regulations fall into two categories: first, statutes and regulations prohibiting fraudulent conduct—Securities Act Section 17(a), Exchange Act Sections 10(b) and 15(c)(1)(A), and Rule 10b-5; and, second, the statute and regulation governing record-keeping by broker-dealer firms—Exchange Act Section 17(a) and Rule 17a-3.

Securities Act Section 17(a), Exchange Act Sections 10(b) and 15(c)(1)(A) and Rule 10b-

---

[5]  In July of 2007, the NASD was consolidated with the regulatory, enforcement, and arbitration bodies of the New York Stock Exchange to form the Financial Industry Regulatory Authority ("FINRA").

5 all proscribe fraudulent conduct in connection with the purchase and/or sale of securities.

Section 17(a) provides that

> [i]t shall be unlawful for any person in the . . . sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
> (1) to employ any device, scheme, or artifice to defraud[;] or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Similarly, Section 10(b) of the Exchange Act prohibits the use of mails or instruments of interstate commerce or "of any facility of any national securities exchange" for employing, in connection with the purchase or sale of any security, "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate[.]" 15 U.S.C. § 78j(b).

Rule 10b-5, promulgated under Section 10(b) of the Exchange Act, also prohibits the use of mails or instruments of interstate commerce or "of any facility of any national securities exchange":

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Section 10(b) and Rule 10b-5 aim "to prevent rigging of the market and to permit operation of the natural law of supply and demand[,]" resulting in a market price that "reflects as nearly as possible a just price." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1466

-24-

(2d Cir. 1996) (internal quotation marks omitted).  Finally, Section 15(c)(1)(A) of the Exchange

Act states that "[n]o broker or dealer shall make use of the mails or any means or instrumentality

of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase

or sale of, any security . . . , by means of any manipulative, deceptive, or other fraudulent device

or contrivance."  15 U.S.C. § 78o(c)(1)(A).

The SEC also seeks to impose secondary liability on Defendants for alleged violations of

Section 17(a)(1) of the Exchange Act and Rule 17a-3.  Section 17(a)(1) of the Exchange Act

requires registered broker-dealers to maintain certain records.  15 U.S.C. § 78q(a)(1).  Rule 17a-3

lists the books and records that must be maintained.  17 C.F.R. § 240.17a-3(a).  Those records

include blotters and ledgers providing data on a broker-dealer's daily trading activity.  17 C.F.R.

§ 240.17a-3(a).  Although there may be limitations to a civil cause of action brought under

Section 17(a) of the Exchange Act, the Court need not address here whether those limitations

preclude the SEC's claim against Defendants in this instance; indeed, neither party presented the

issue to the Court.  *See Touche Ross & Co. v. Redington*, 442 U.S. 56, 569-571 (1979).[6]

---

[6]  In *Touche Ross*, the Supreme Court of the United States held that a private cause of
action for a violation of Section 17(a) did not exist.  *Touche Ross*, *supra*, 442 U.S. at 569.  In so
holding, the Supreme Court found that Section 17(a) "neither confers rights on private parties
*nor proscribes any conduct as unlawful*."  *Ibid.* (emphasis supplied).  The Supreme Court added
that, "[b]y its terms, [Section] 17(a) is forward-looking, not retrospective; it seeks to forestall
insolvency, not to provide[]recompense after it has occurred."  *Id.* at 570.  As a result, the
Supreme Court concluded that "there is no basis in the language of [Section] 17(a) for inferring
that a civil cause of action for damages lay in favor of anyone."  *Id.* at 570-71.  This holding
clarifies that Section 17(a) provides no private cause of action for damages.  However, *Touche
Ross* appears to create an ambiguity as to whether Section 17(a) provides for *any* civil cause of
action, irrespective of the relief sought.

Here, the SEC seeks injunctive relief for Defendants' alleged aiding and abetting
violations of Section 17(a).  Specifically, the SEC asserts that Knight, Joseph, and other sales
traders at Knight misused trade modifiers on the ACT Service.  Based on the holding of *Touche
Ross*, it appears to the Court that an issue may arise due to the holding of *Touche Ross* as to

In addition to seeking primary liability for Defendants' alleged violations of Section 17(a) of the Securities Act, the SEC invokes Sections 20(e) and (a) to impose secondary liability for underlying violations of Sections 10(b), 15(c)(1)(A), and 17(a) of the Exchange Act, as well as Rules 10b-5 and 17a-3.  15 U.S.C. § 78t(a), (e).  Section 20(e) governs aiding and abetting persons, while Section 20(a) governs controlling persons.  The SEC claims that Defendants aided and abetted Joseph's violations of the Exchange Act.  Section 20(e) of the Exchange Act imposes liability upon those persons who aid and abet violations of the Act.  15 U.S.C. § 78t(e).  That statute provides that

> any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

*Ibid.*

The SEC also alleges that Pasternak is liable for the violations of Exchange Act Sections 15(c)(1)(A) and 17(a) and Rule 17a-3 committed by John, Joseph, and Knight.[7]  Section 20(a) imposes joint and several liability on "control persons."  That statute provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any

whether the SEC may assert a cause of action for injunctive relief under this statute.

[7]  The SEC's trial brief and brief in opposition to Defendants' motion for partial judgment state that it seeks control liability for alleged violations of Exchange Act Section 10(b) and Rule 10b-5.  The Amended Complaint, however, does not assert that Section and Rule as the underlying violations.  Because the elements necessary to show a violation of Section 10(b) mirror those elements necessary to establish a violation of Section 15(c)(1), the Court finds the contradiction between the SEC's briefs and the Amended Complaint to be a distinction without a difference.  Accordingly, the Court considers here the underlying violations as those set forth in the Amended Complaint.

-26-

person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  The purpose of this provision is "to impose liability on persons who were able to directly or indirectly exert influence on the policy and decision-making process of others."  *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 884 (3d Cir. 1975).

### B.    Applicable NASD Regulations

The NASDAQ is a self-regulating market owned and regulated by the NASD.  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 169 (3d Cir. 2001).  The SEC exercises oversight authority over the NASD.  *Ibid.*; 15 U.S.C. §§ 78f, 78o-3, 78s.  To regulate the market and its members, the NASD promulgates rules, policies, and guidelines.  *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 914 (3d Cir. 1992).  The present case necessarily implicates some of those rules and regulations in effect in 1999 and 2000.

On all trading, the NASD requires "best execution."  NASD Rule 2320; (Exhibit 89). Subsection (a) of Rule 2320 states:

> In any transaction for or with a customer or a customer of another broker-dealer, a member and person associated with a member shall use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions.  Among the factors that will be considered in determining whether a member has used "reasonable diligence" are:
> (1) the character of the market for the security, e.g., price, volatility, relative liquidity, and pressure on available communications;
> (2) the size and type of transaction;
> (3) the number of markets checked;
> (4) accessability of the quotation; and
> (5) the terms and conditions of the order which result in the transaction, as communicated to the member and persons associated with the member.

NASD Rule 2320(a); (Exhibit 89).  Subsection (f) of that Rule further explains that the best

execution obligation applies "where the member acts as agent for the account of his customer" and "where retail transactions are executed as principal and contemporaneously offset."  NASD Rule 2320(f); (Exhibit 89).  However, "[s]uch obligations do not relate to the reasonableness of commission rates, markups or markdowns which are governed by Rule 2440 and IM-2440." NASD Rule 2320(f); (Exhibit 89).

To further explain Rule 2320, the NASD issued Interpretive Memo ("IM") 2320, entitled "Interpretive Guidance with Respect to Best Execution Requirements."  IM-2320; (Exhibit 89). To also explain Rule 2320, the NASD issued Notice to Members ("NTM") 97-57 in 1997, providing guidance on SEC order handling rules, NASD limit order protection rules, and best execution responsibilities.  NTM 97-57 (Sept. 1997); (Exhibit 84).  NTM 97-57 explains that "the application of best execution concepts necessarily involves a 'facts and circumstances' analysis[]" and that the best execution obligation "evolves as rules and systems change."  NTM 97-57 (Sept. 1997); (Exhibit 84 at 457, "Questions and Answers").  In addition, this NTM specifically discusses how a market maker meets the best execution requirement when handling a discretionary, not-held order.  NTM 97-57 (Sept. 1997); (Exhibit 84 at 460, "Answer 8").

The NASD also regulates prices and commissions where a market maker buys or sells for its own account from or to its customer.  NASD Rule 2440; (Exhibit 944).  Rule 2440 provides that, in those instances, a broker-dealer

shall buy or sell at a price which is fair, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense involved, and the fact that he is entitled to a profit; and if he acts as agent for his customer in any such transaction, he shall not charge his customer more than a fair commission or service charge, taking into consideration all relevant circumstances, including market conditions with respect to such security at the time of the transaction, the expense of executing the order[,] and the value of

-28-

any service he may have rendered by reason of his experience in and knowledge of such security and the market therefor.

NASD Rule 2440; (Exhibit 944).

To further ensure fair dealing with customers, the NASD implemented a "5% Policy" applicable to commissions, markups, and markdowns.  NTM 93-81 (1993).  Pursuant to that policy, the NASD warns that "it may be conduct inconsistent with just and equitable principles of trade for a member to charge a commission that is not reasonable."  NTM 93-81 (1993).  Fairness and reasonableness of a commission or markup "is determined by considering all relevant factors to the transaction[,] including market conditions with respect to such security at the time of the transaction, the expense of executing the order[,] and the value of any service he may have rendered by reason of his experience in and knowledge of such security and the market therefore."  NTM 93-81 (1993).  To establish a general guide for determining fairness and reasonableness, the NASD finds that a commission or markup should not generally exceed five percent of the total transaction amount, "unless the member can show or document factors under the policy that justify a higher amount."  NTM 93-81 (1993).  Essentially, "the percentage of commission on the transaction is only *one*" relevant factor to determine if a commission is fair.  NTM 93-81 (1993) (emphasis supplied).

In terms of reporting requirements, the NASD explained a then-recent rule change to reporting riskless principal transactions in NTM 99-65.  NTM 99-65 (August 1999); (Exhibit 85).  Essentially, the new rule, effective September 30, 1999, permitted market makers to report certain transactions once, rather than twice, where it executes a trade at the same price as the order.  NTM 99-65 (August 1999); (Exhibit 85 at 429, "General Questions" 1 & 3).

Significantly, neither the new rule nor any other rule prevented market makers "from

accumulating a position at one price and executing the offsetting trade with the customer at

another price (with no markup, markdown, commission equivalent, or other fee)[.]"  NTM 99-65

(August 1999); (Exhibit 85 at 430, "General Questions" 6).

      NASD Rule 2110 requires "high standards of commercial honor and just and equitable

principles of trade."  IM-2110-2; (Exhibit 1109).  Based on this Rule, the NASD maintains a

policy prohibiting "front running," as expressed in IM-2110-3, as well as "trading ahead" on

limit orders, as set forth in IM-2110-2.  IM-2110-3; (Exhibit 1024); IM-2110-2; (Exhibit 1109).

IM-2110-3 provides:

> It shall be considered conduct inconsistent with just and equitable principles of trade
> for a member or person associated with a member, for an account in which such
> member or person associated with a member has an interest, for an account with
> respect to which such member or person associated with a member exercises
> investment discretion, or for certain customer accounts, to cause to be executed:
>
> (a) an order to buy or sell an option or a security future when such member or person
> associated with a member causing such order to be executed has material, non-public
> market information concerning an imminent block transaction in the underlying
> security, or when a customer has been provided such material, non-public market
> information by the member or any person associated with a member; or
>
> (b) an order to buy or sell an underlying security when such member or person
> associated with a member causing such order to be executed has material, non-public
> market information concerning an imminent block transaction in an option or a
> security future overlying that security, or when a customer has been provided such
> material, non-public market information by the member or any person associated
> with a member; prior to the time information concerning the block transaction has
> been made publicly available.

IM-2110-3; (Exhibit 1024).

      Similarly, IM-2110-2 explains that, based on Rules 2110 and 2320, a member cannot

"trade ahead" of customer limit orders.  This policy states that NASD "members that handle

customer limit orders, whether received from their own customers or from another member, are prohibited from trading at prices equal or superior to that of the limit order without executing the limit order." IM-2110-2; (Exhibit 1109). As a result, the NASD requires its members to handle limit orders with all due care so that members do not trade ahead of customer limit orders. IM-2110-2; (Exhibit 1109).

## III.   FINDINGS OF FACT

Having summarized the testimony presented, accorded weight as deemed appropriate, and set the legal and regulatory lens through which the Court must analyze the facts presented, the Court now sets forth its findings of fact. The Court notes that it rejects the proposed findings of fact submitted on numerous occasions by the SEC. Rather, the Court finds that a preponderance of the evidence submitted supports the facts proposed by Defendants.

### A.   Background of the NASDAQ Market in 1999-2000 and Formation of Knight Securities

The presently complained-of trades executed by Joseph occurred in the NASDAQ stock exchange, an over-the-counter securities market. (Am. Cmplt. ¶ 13); (Tr. 56:5-10). The NASDAQ market operates through multiple market-making firms. (Tr. 671:16-17). Essentially, a market maker serves as a broker-dealer to execute sell and buy orders for traded stocks on behalf of its customers. (Tr. 1658:16-1659:13).

In so doing, the NASD requires market makers to buy or sell on behalf of a customer "at a price that is fair, taking into consideration all relevant circumstances[.]" NASD Rule 2440; (Exhibit 944). Thus, a market maker must find the best price of a particular stock, whether the best priced stock is from the market making firm's own inventory of stock or from another

source.  (Tr. 1659:3-13).  The best price depends on whether the order is to buy or to sell: the

best offer price is the cheapest price at which one could buy a stock, whereas the best bid price is

the highest price at which one could sell a stock.[8]  (Tr. 1659:14-20).  To find the best price, the

market maker must consider the market conditions for the particular security, the expense of the

transaction, and the market maker's entitlement to a profit.  NASD Rule 2440; (Exhibit 944);

(Tr. 891:12-893:25).  To ascertain if a price is "fair and reasonable," one must compare that price

with other prices in the marketplace, (Tr.713:2-715:5), and conduct a trade-by-trade "facts and

circumstances analysis[,]" (Tr. 893:10-25).

     As part of their business, and to maintain an orderly market, these firms must necessarily

commit their own capital, (Tr. 671:21-23), particularly in instances where the firm's inventory of

stock provides the best offer or bid prices, (Tr. 1659:21-1660:23).  As a result, market making

firms compete against each other by publicizing quotes on a particular stock in their inventory to

attract order flow and volume.  (Tr. 671:16-20, 1659:21-1660:4).

     In carrying out its business, a market making firm handles different types of orders.  (Tr.

672:11-674:5).  One type is the "market order," which a market maker must execute

"instantaneously against the best quoted market."  (Tr. 672:15-22).  The purpose of a market

order is immediate best execution.  (Tr. 673:10-11).  Another type of order is the "limit order,"

where the customer specifically instructs the market maker to execute a trade when the stock

reaches a particular price.  (Tr. 672:23- 673:1).  The focus of a limit order is the price.  (Tr.

673:11-12).

     A market maker also executes "not-held orders."  (Tr. 673:2-677:16).  A customer

---

[8]  These prices are reported as the national best bid and offer ("NBBO") prices.

placing a not-held order provides the market maker with the volume of a particular stock sought to be bought or sold and grants the market maker discretion as to price and time of execution of that trade, with the goal of achieving "best execution."  (Tr. 673:2-9).  On a not-held order, a market maker is not "held" to the immediacy and price requirements imposed in a market or limit order.  (Tr. 673:2-16).

The NASD has defined a not-held, or "working," order as "an order voluntarily categorized by the customer as permitting the member to trade at any price without being required to execute the customer order."  NTM 97-57 (Sept. 1997); (Exhibit 84 at 460, "Answer 8").  When handling such an order, a broker-dealer "must use its brokerage judgment in the execution of the order, and if such judgment is properly exercised, the broker is relieved of its normal responsibilities with respect to the time of execution and the price or prices of execution of such an order."  NTM 97-57 (Sept. 1997); (Exhibit 84 at 460, "Answer 8").  Although the customer bestows discretion to the broker-dealer, a customer nevertheless monitors the transaction and modifies the parameters of the order as it deems necessary.  (Tr. 975:13-976:15).

In the NASDAQ market, a trade in stock can be either on a principal or agency basis.  (Tr. 917:18-918:20).  The NASD defines a principal trade as "a trade in which the broker-dealer buys or sells for an account in which the broker-dealer has a beneficial ownership interest[,]" such as a proprietary account.  (Tr. 917:24-918:9).  In contrast, an agency trade is "a trade in which a broker-dealer . . . acts as an independent intermediary for the account of its customer[]" and does not execute orders in a proprietary account.  (Tr. 918:10-20).  An agency trade is generally considered to be a riskless transaction for the broker-dealer.  (Tr. 678:1-14).

A principal trade may also be riskless.  (Tr. 678:1-22, 918:25-919:12).  The NASD

defines a riskless principal trade as a trade "in which a broker-dealer, after having received an order to buy[ or ]sell a security, purchases[ or ]sells a security as princip[al] at the same price . . . to satisfy that order." (Tr. 919:2-12); NTM 99-65 (Aug. 1999); (Exhibit 85 at 429, "General Questions" 3). On a riskless principal trade, the broker-dealer charges its customer a disclosed mark-up, mark-down, or commission. (Tr. 678:15-22, 919:2-12).

Most market makers executing institutional orders between the years 1999 to 2000, executed net trades, "accumulating shares at one price and executing to customers at a different price." (SEC Stipulated Facts, Final Pretrial Order 1/02/2008 ("SEC Stip.") at 17 ¶ 48); (John Stipulated Facts, Final Pretrial Order 1/02/2008 ("John Stip.") at 5 ¶ 16); (Tr. 678:19-679:5, 919:16-920:4). The NASD defines a net trade as one in which "a market maker, at the request of a customer[,] while holding a customer order[] to buy[ or ]sell executes a buy[ or ]sell as princip[al] at one price from the street or another customer and then executes an offsetting sell [or] buy from the customer at a different price." (Tr. 919:18-22); (John Stip. at 5 ¶ 17); NTM 97-57 (Sept. 1997); (Exhibit 84 at 460, "Answer 8").

The market maker's profit is then the difference between the price of the market maker's transaction and the price of the transaction to the customer, or the "spread." (Tr. 919:22-25). Such profit on net trades, generally, are not separately disclosed to the customer. (Tr. 919:22-920:8). Furthermore, apart from the fair and reasonable price requirement, no NASD rule or regulation, or industry standard, sets a maximum limit on the profit or spread generated on a net order. (Tr. 713:2-6, 2344:21-2345:4, 2027:21-2028:2).

However, the NASD specifically requires traders to provide "best execution" on not-held orders. (Tr. 684:22-686:8, 2346:15-2347:3); (Exhibit 89). According to NASD Rule 2320, a

broker-dealer must "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions." NASD Rule 2320(a); (Exhibit 89). That Rule further sets forth various factors considered to determine whether "reasonable diligence" is met; those factors include: "the character of the market for the security"—such as, price, volatility, and liquidity; "the size and type of transaction;" "the number of markets checked;" the "accessibility of the quotation;" and "the terms and conditions of the order[.]" NASD Rule 2320(a)(1)-(5); (Exhibit 89). Thus, whether a broker-dealer provides best execution depends upon a plethora of factors, including, but not limited to: market conditions; the trade's impact on the market; the ultimate price paid or received; the availability of anonymity to the customer; and the trade's impact on the customer's overall portfolio. (Tr. 684:24-685:23, 2346:17-2347:3, 2387:12-2390:23).

In addition, Section II of NTM 97-57 explains that a market maker handling a not-held order "does not owe the same best execution obligations to [its customer] as it would if the order were a non-discretionary market or limit order." NTM 97-57 (Sept. 1997); (Exhibit 84 at 460, "Answer 8"). NTM 97-57 explains that the discretion granted in a not-held order "means that the firm may trade at the same price or at a better price than that received by the discretionary order[,]" provided the market maker seeks "to obtain the best fill considering all of the terms agreed to with the customer and the market conditions surrounding the order." NTM 97-57 (Sept. 1997); (Exhibit 84 at 460, "Answer 8"). To seek that "best fill," the customer and market maker could agree that the market maker may, "if necessary to fill the entire order at an acceptable price, trade ahead of the institutional customer's order." NTM 97-57 (Sept. 1997);

(Exhibit 84 at 460, "Question 8").

Importantly, whether a market making firm meets the best execution requirement on a particular trade is based primarily on the customer's assessment of the firm's ability to follow instructions.  (Tr. 2385:13-17).  A customer generally focuses on the ultimate price received for the trade, comparing that price with the volume-weighted average price, or "VWAP," to determine the quality of a trade.  (Tr. 309:15-21, 334:6-335:17, 371:25-372:23).  Essentially, the customer is in the best position to ascertain whether best execution is met, as the customer knows its instructions and specific trading strategy.  (Tr. 2386:1-6).  As a result, unless the customer raises a concern about the execution of a trade, it would be difficult for a trader or supervisor to determine that the customer was not satisfied with an execution.  (Tr. 2386:21-2387:2).

During the time period relevant to this action, 1999 through 2000, the NASDAQ market reached a historical high point of volatility.  (Tr. 122:24-124:16, 130:12-134:12, 307:13-21, 415:6-416:18, 2029:6-2031:6); (Exhibit 1106 at 100:5-15 (Miller)); (Exhibit 1111 at 19:6-8, 46:2-7 (Mitrano)); (Exhibit 1104 at 35:7-36:11 (Schubert)); (Exhibit 1105 at 46:2-9, 48:24-50:24 (K. Smith)); (Exhibit 1113 at 41:22-44:12 (F. Smith)); (Exhibit 1119 at 135:14-21, 137:18-138:17, 178:23-179:15 (Perry)).  The volatility of the market is exemplified by the trading that occurred on April 4, 2000, "the single most high volume day in the history of NASDAQ[.]"  (Tr. 2030:15-2031:6).  On that day, the market was both a bear and a bull market, resulting in about "a 20 percent correction and a recovery in the course of one day."  (Tr. 2030:15-23).  Based on such volatility, Brooks characterized this period in the NASDAQ market as being unprecedented in the securities industry and causing "a real mania[.]"  (Tr. 131:3-11).

Prior to this period of volatility and "mania[,]" in 1995, Pasternak, with Walter Raquet

-36-

("Raquet"), formed Knight Trimark Group ("Knight Trimark"),[9] Knight's holding company.  (Tr. 1980:5-1981:15); (Defendants Stipulated Facts, Final Pretrial Order 1/02/2008 ("Defs. Stip.") at 5 ¶ 1).  At that time, the business idea behind the formation of Knight was novel in the industry: it was "the next generation market maker."  (Tr. 1981:11-15).  According to Pasternak, he realized the potential for technological advances, like the internet, to further promote what he saw as the "emerging democratization of individual investors[.]"  (Tr. 1980:16-1981:15). Pasternak described Knight's business as being "predicated on that self-directed investor[] becom[ing] very, very active[,] and [Knight was to] provid[e] the execution capability so when [the investor] pushed the button, he expected to get back his fill in its entirety in a nano second." (Tr. 1982:21-24).  In addition to offering automatic executions on trades, Pasternak's business plan also envisioned trading at higher volumes.  (Tr. 2000:22-2001:3).  Essentially, Pasternak and Raquet formed Knight with the anticipation that there would be a "boom" in retail order flow and the hope that Knight could capture that flow.  (Tr. 1982:8-1983:1).

Indeed, that boom did occur.  The "democratization" of investors, originally spurred by the availability of 1-800 telephone numbers for investment, resulted in higher volume retail transactions.  (Tr. 1980:14-1982:24).  To illustrate the change in volume, Pasternak testified that "retail transactions went from about ten percent of the market to nearly [fifty] percent five years later[.]"  (Tr. 1982:15-17).

With that concept in mind, Pasternak and Raquet formed, in 1995, Knight Trimark and Knight, headquartered in Jersey City, New Jersey.  (Tr. 1980:5-1981:15).  Knight's structure included an institutional sales desk composed of the sales traders and a market making desk

---

[9]  Knight Trimark is now known as Knight Capital Markets.  (Tr. 1987:10-14).

composed of the market makers.  (John Stip. at 4 ¶ 6).  That same year, John joined Knight.

(Defs. Stip. at 5 ¶ 3).  Approximately one year thereafter, in 1996, John's brother, Joseph, joined

Knight as senior vice president of institutional trading.  (SEC Stip. at 15 ¶ 22).  Some point

thereafter, John, upon becoming supervisor of the institutional sales desk, gave his largest

accounts to Joseph.  (SEC Stip. at 14 ¶ 8, 16 ¶ 31).  To recognize that many of Joseph's accounts

originated from John, John "was given a percentage of the sales credits attributed to Joseph['s]

trades[.]"  (SEC Stip. at 14 ¶ 9, 16 ¶ 31).  Significantly, Joseph's accounts included many of

Knight's largest institutional clients.  (SEC Stip. at 16 ¶ 30).  However, in March of 2000,

Pasternak terminated the shared compensation agreement between John and Joseph.  (SEC Stip.

at 15 ¶ 28); (Tr. 1895:5-23).

        In March of 1998, Knight became a publicly-traded company by making an initial public

offering ("IPO").  (Tr. 1984:21-22).  Knight made a secondary offering in 1999.  (Tr. 1985:4-15).

As part of its obligations as a publicly-traded company, Knight, through its Directors, filed the

SEC-required Form 10-K in 1999 and 2000.  (Exhibits 81-82).  Those documents represented

that Knight offered best execution to its customers.  (Exhibit 82 at 04978 (1999)); (Exhibit 81 at

04966 (2000)).

        Until January 31, 2002, Pasternak served as Chief Executive Officer ("CEO") and

Chairman of both Knight Trimark and Knight.  (Defs. Stip. at 5 ¶ 1).  As CEO and Chairman,

Pasternak had various additional responsibilities throughout the IPO and secondary offering,

including interviewing and recruiting board members and bankers and traveling for the "road

show."  (Tr. 1986:8-22).  During the relevant time period, Pasternak also held multiple securities

licenses, (Defs. Stip. at 5 ¶ 2), and had a financial interest in a particular market making account,

-38-

number 1002, over which Pasternak maintained decision-making authority, (Defs. Stip. at 7 ¶¶ 22-23); (SEC Stip. at 16 ¶ 29).

### B.     Knight's Execution of Trades and Retail Order Flow

Considering the background of the NASDAQ market and the formation of Knight, the Court now turns to the methodology employed by Knight to execute institutional orders. Knight's business goal was to commit capital, creating a risk, and to effectively manage that risk to generate a profit.  (Tr. 2032:10-13).  To further that goal, Knight handled both institutional orders and retail order flow, resulting in unique business practices.  (Tr. 111:6-22, 162:22-163:9, 1272:17-1273:22, 1672:18-23, 1980:14-1983:1).  At issue in this case is Knight's handling of institutional orders.  However, Knight's traders executed those institutional orders in tandem with the retail order flow; thus, it is pivotal in this case to understand how Knight handled both types of orders.

### 1.     *Institutional Orders*

Between 1999 and 2000, Knight, on behalf of its institutional customers, primarily executed not-held orders, (Defs. Stip. at 7 ¶ 19), typically conducted on a "net basis[,]" (John Stip. at 5 ¶ 16).  To generate institutional orders, Knight used the electronic medium, AutEx. (Tr. 2017:13-21).  Through AutEx, Knight sent electronic advertisements to the buy-side, indicating that Knight could provide a natural trade of a particular volume in a stock.  (Tr. 2017:13-21).  Knight, as part of a mandatory protocol, required its traders to advertise over AutEx any order imbalance above 25,000 shares.  (Tr. 2017:25-2018:2).

During the relevant time period, institutional orders streamed into Knight via an electronic message or the telephone.  (Tr. 451:17-22).  If the order came to Knight via telephone,

then a sales trader, or his assistant, would complete an order ticket.  (Tr. 454:14-25); (Exhibit 1106 at 45:6-51:3, 55:5-59:18 (Miller)); (Exhibit 1111 at 27:22-33:5 (Mitrano)).  An order ticket specified the date and time of receipt of the order, the stock symbol, the volume of shares, whether the order is held or not-held, and whether the order is a short or long sale.  (Tr. 454:19-22); (Exhibit 1106 at 45:6-51:3, 55:5-59:18 (Miller)); (Exhibit 1111 at 27:22-33:5 (Mitrano)).

Upon receipt of an order, a sales trader discussed the order with the customer to understand the customer's goals for that order.  (Tr. 452:15-453:5, 1183:16-1184:2).  The customer would give the sales traders any particular instructions it had on the order, including how the trader should work the order, the price parameters, and size.  (Tr. 452:17-19, 454:10-13, 1011:15-24).  Such instructions could include a request for the staggering of the trade; that is, the customer gave the sales trader its ultimate volume goal, but instructed the trader to initially execute only a portion thereof.  (Tr. 453:6-11).  On net trades, the customer and sales trader would negotiate the final price of the stock bought by or sold to the customer.  (Exhibit 1103 at 26:10-13 (Thornton)).  Generally, order sizes ranged, during the 1999 to 2000 time period, from under one hundred shares to millions of shares.  (Tr. 452:1-7).

After obtaining the instructions from the customer, the sales trader contacted the market maker who maintained an account, or "book," on the particular stock included in the order.  (Tr. 452:19-23).  The sales trader passed the order on to the market maker, who would relay to the trader any relevant market information.  (Tr. 452:19-23, 453:16-19).  The sales trader then provided the customer with feedback and information obtained from the market maker, while the market maker began to execute the order, either buying or selling the stock.  (Tr. 452:19-23).

As the market maker worked the institutional order, the sales trader monitored the market

-40-

maker's activity through Knight's automated, computer-based trade and order management tool, the Brokerage Real Time Application Support System ("BRASS").  (Tr. 455:1-13).  On BRASS, a sales trader can observe the market maker's position in the stock and attempt to sift out the position taken on behalf of the trader's institutional customer, rather than for another institutional order, retail order, or proprietary trading.  (Tr. 455:12-22, 456:13-25); (Exhibit 1106 at 77:4-24 (Miller)).  If anything appeared on BRASS that the execution of the order might not be going well, the sales trader would call the customer to determine how the customer would like to react.  (Tr. 455:3-8).  In addition, throughout the entire transaction, the customer would closely monitor the marketplace in respect of the ordered trade, observing price and volume fluctuations.  (SEC Stip. at 13 ¶ 5).  Based on the changes in the market, the customer may modify or cancel the order at any moment.  (Tr. 75:17-76:4, 165:4-20, 309:7-14, 330:21-331:17, 333:2-5, 372:21-373:10, 416:21-417:2, 418:5-23).

As part of working a not-held order, a market maker fulfilling that order may commit Knight's capital to facilitate that trade, resulting in a "risk trade."  (Tr. 468:2-473:3, 623:7-22, 1016:1-11, 1687:18-23).  For example, a market maker may commit capital if the institutional order requires stock not readily available in the market.  (Tr. 468:8-24).  Although this practice is not required of a market making firm, it benefits customer relations.  (Tr. 468:17-24).  If he chooses to do so, a market maker may commit capital at any point in the working of the institutional order.  (Tr. 469:7-15).  In instances in which a market maker commits capital, a sales trader, as a matter of courtesy, not as a requirement, tells the customer that Knight committed capital on the particular trade.  (Tr. 469:16-470:1, 549:12-16).  Other times, a customer may specifically request that Knight commit capital, such as where the customer sought an immediate

-41-

print.  (Tr. 472:3-473:1).

The final step in executing an institutional order is "the print" to NASDAQ "tape[,]" the Automated Confirmation Transaction ("ACT") Service—a consolidated record reflecting all transactions occurring in the NASDAQ market.  (Tr. 462:7-12, 1673:14-22); (John Stip. at 5 ¶ 14); (Defs. Stip. at 10 ¶¶ 49-50).  The print is essentially a confirmation to the customer and a record to NASDAQ of the trade conducted on behalf of the institutional customer.  (Tr. 459:12-460:5).  The print to the customer indicates the volume of the stock traded and the final price at which the customer bought the stock or at which the customer sold Knight the stock.  (Tr. 462:1319, 1673:17-19).

A sales trader, or his assistant, would be the person responsible for the print.  (Tr. 459:6-10, 1673:20-22); (Defs. Stip. at 10 ¶ 50); (Exhibit 1106 at 77:25-78:17 (Miller)); (Exhibit 1111 at 48:21-22 (Mitrano)).  Once a print was made, the customer would receive acknowledgment of the print from its electronic order management system or by a telephone call from the Knight sales trader working the order.  (Tr. 460:6-10).

Importantly, a customer could provide specific instructions on when it wanted the transaction printed, and those instructions varied from customer to customer.  (Tr. 457:22-458:5). Based on customer instructions, or in the sales trader's discretion in working the order, the complete execution of an institutional order could occur over a period of time and include multiple, piecemeal prints to the customer.  (Tr. 461:2-21).  If an order was for a large volume of shares or a highly-volatile stock, a sales trader or his assistant could print the transaction outside of the national best bid and offer price.  (Tr. 2387:3-6).  In those instances, Knight's compliance department required the print to include an "ACT modifier," such as ".SLD" or ".PRP[,]"

-42-

indicating that the print was out of time sequence.  (Tr. 1020:6-20); (Exhibit 1106 at 100:16-106:13, 108:19-21 (Miller)); (Exhibit 1111 at 55:12-57:20 (Mitrano)).

At Knight, in addition to the NASD requirements of fair price and best execution, the sales traders had a performance commitment to satisfy their customers' expectations as to price.  (Tr. 2033:3-17).  Because the institutional customer "focused on the price [it] receive[d] against [its] instructions[,]" the sales traded needed "to create an outcome that satisfie[d] the customer[.]"  (Tr. 2033:10-12).  If the trader failed to create a satisfactory outcome, then Knight would "have to buy stock at inferior prices . . . and essentially lose money."  (Tr. 2033:11-14).  In such an instance, a sales trader would not discuss the issue with the customer, but, rather, would print the transaction to the customer at what the trader believed to be a fair price.  (Tr. 2034:8-16).  Indeed, all not-held institutional orders required a performance commitment.  (Tr. 2035:16-20).  At times, an institutional order could require both capital and performance commitments by Knight.  (Tr. 2034:20-24).  In those instances, capital commitments could occur at any point in the execution of an order and would be in addition to the performance commitment that is always existent.  (Tr. 2035:2-2036:7).

Knight was also at risk during the overnight period.  (Tr. 1720:22-1721:2, 2053:5-2054:19).  Trading conducted the day before and various events occurring overnight would affect the value and actual price of stocks held by Knight.  (Tr. 2053:5-2054:9).  That inventory of stock held overnight could be the result of a not-held order executed that day or held overnight as part of the consummation of an earlier-placed order.  (Tr. 2058:8-24).

## 2.    *Retail Orders*

In conjunction with institutional orders, Knight also handled retail orders.  (Tr. 111:6-22,

162:22-163:9, 1272:17-1273:22, 1672:18-23, 1980:14-1983:1).  Those orders were both buy and sell orders; thereby, Knight accumulated positions in a security by executing those retail orders.  (Tr. 2402:2-6, 2405:13-2406:7).

Knight automatically executed much of that retail order flow to provide its retail customers with liquidity not otherwise available.  (Tr. 1670:13-1673:3).  Essentially, Knight would provide automatic execution on a stock based on its liquidity and volatility up to a certain volume in a particular period of time.  (Tr. 1670:24-1671:2).  Knight labeled that threshold volume and period of time as a "firewall."  (Tr. 1671:4-11).  Theoretically, once retail order executions reached that firewall, Knight's computer system prevented any further automatic execution of retail orders, which would then "go to a manual mode[.]"  (Tr. 1671:2-3).  The manual mode ensured that Knight did not provide non-existent liquidity for a particular stock.  (Tr. 1671:2-3).

However, due to a computer or technical error in Knight's system, the manual mode did not initiate once the actual firewall was reached; rather, the manual mode initiated when Knight was in a net position of the firewall.  (Tr. 1671:4-18).  In other words, the automatic executions would deplete Knight's inventory in a particular stock and continue thereafter until reaching the volume set in the firewall.  (Tr. 1671:12-23).  Despite this issue, Knight's provision of automatic executions was pivotal to its unique business practice.  (Tr. 1672:18-1673:3).

Because of that firewall issue, however, the automatic execution of retail orders could deplete an inventory acquired to fill an institutional order.  (Tr. 1671:12-1672:1).  As a result, Knight's market makers could protect positions built for an institutional order by moving those inventories to a "back book[.]"  (Tr. 1669:10-1670:4, 1723:5-1724:2).  Typically, the back book

-44-

was used by market makers as a principal account; that is, an account used to take positions for the firm, rather than on behalf of customers.  (Tr. 1669:6-24).

To distinguish itself from its competitors, Knight offered on its retail orders an "opening guarantee[,]" which was generally unprofitable to Knight, (Tr. 2000:2-21), but provided Knight with the opportunity to attract more volume to its business, (Tr. 2000:22-2001:3).  Knight's opening guarantee assured customers that Knight would execute both buy and sell trades at the midpoint of the opening national best bid price and national best offer price.  (Tr. 2002:25-2003:12, 2004:1-3).  Essentially, the opening guarantee guaranteed customers execution of trades at the same price, irrespective of the timing in which the customer placed the order.  (Tr. 2001:4-2003:4).

### 3.    *Sales Credit Data*

Knight's trading data collected both retail order executions and institutional order executions.  (Tr. 2401:18-2402:11).  The recorded data reflects the position held by Knight in a particular security and does not differentiate between the types of orders executed.  (Tr. 1809:23-1810:3, 1811:4-18, 2401:18-2402:11); (Exhibit 111 at 61:22-62:16 (Mitrano)).

Knight used this trading data to compensate its institutional sales traders.  Knight remunerated its institutional sales traders a percentage of the profit or loss on a particular institutional trade.  (Tr. 473:4-10, 1876:19-1877:7).  At the end of a trading day, each market maker would have a BRASS-generated profit and loss number, called "P&L[,]" attributed to all of the trades he executed that day.  (Tr. 526:20-527:1).  Generally, assistant traders would calculate manually, from the P&L number, a sales trader's "sales credit"—that is, the allocation of the overall P&L on a particular stock to an institutional order transacted by the sales trader.

(Tr. 524:24-528:14, 1876:19-1877:7, 1880:10-16); (Exhibit 1106 at 112:16-119:18 (Miller));

(Exhibit 1111 at 60:1-63:12 (Mitrano)).

Essentially, the calculation of a sales credit was "a negotiation of who would get what

share of the profits for each day, based on what each party thought they contributed to that

P&L[.]"  (Tr. 528:11-14, 1877:11-21).  This is because Knight's trade run data did not

differentiate between trades executed for retail orders, institutional orders, and proprietary

trading.  (Tr. 1809:23-1810:3, 1811:4-18, 2401:18-2402:11); (Exhibit 111 at 61:22-62:16

(Mitrano)).  Such an allocation necessarily required an analysis of multiple factors that interacted

throughout the daily trading of the particular stock.  (Exhibit 1106 at 113:7-119:18 (Miller)).

Knight did not maintain any internal written guidelines as to how to allocate sales credit to a

sales trader.  (Tr. 526:3-13).

### C.     Knight's Supervisory and Compliance Structures

Knight maintained a system of supervisory personnel, as well as a compliance

department.  (Tr. 2334:15-16).  At the top of that supervisory system, in 1999 and 2000, was

Pasternak, under whom were varying levels of supervisors for both the market making desk and

the institutional sales desk.  (Tr. 2334:16-25).

Between 1995 and 2000, Pasternak was the supervisor over Knight's market making

desk.  (John Stip. at 4 ¶ 2); (Tr. 2374:23-2375:8); (Exhibit 36 at KN 1265); (Exhibit 37 at

47198.  As part of that responsibility, Pasternak, on a daily basis, received and reviewed spread

sheets indicating each market maker's positions and profit and loss information.  (John Stip. at 4

¶ 3); (Defs. Stip. at 6 ¶¶ 8-9).  Pasternak also maintained an active market making

account—number 1002.  (John Stip. at 4 ¶ 9); (Defs. Stip. at 7 ¶¶ 21-23).  Pasternak was able to

observe all trades executed through that account.  (John Stip. at 4-5 ¶ 12); (Defs. Stip. at 10 ¶ 48).  To observe those trades, Pasternak would access periodically information on Knight's BRASS system.  (John Stip. at 5 ¶ 13); (Defs. Stip. at 7 ¶ 20); (Tr. 2376:20-2377:3).

From 1995 to August 2000, John supervised the institutional sales desk, including his brother Joseph, (Defs. Stip. at 5 ¶¶ 3-4); (SEC Stip. at 13 ¶¶ 2-3); (Tr. 2372:1-9, 2374:16-22), and directly reported to Pasternak, (SEC Stip. at 15 ¶ 26); (Tr. 2364:12-15).  (Exhibit 36 at KN 1265); (Exhibit 37 at 47198.  In addition, the sales traders were divided into sub-groups under team captains.  (Tr. 2334:18-21).  One particular team captain on the institutional sales desk, Jeffrey Hoobler, served as liaison between the sales desk and Knight's legal and compliance departments.  (SEC Stip. at 13-14 ¶ 6); (Tr. 2328:23-2329:2).

As part of his supervisory responsibilities, John was to conduct daily reviews of the institutional trading activity and what Knight labeled "trade allocation reports."  (Tr. 2373:8-2374:1, 2378:11-18); (Exhibits 49-68).  John would review the reports of the trade runs, initial the documents, and submit them to another person, possibly someone within the compliance department.  (Tr. 2378:11-18).  In addition, John held regular meetings for the institutional sales desk where traders could discuss compliance issues.  (Tr. 1062:1-22).  Knight also required its sales traders to attend annual compliance meetings and continuing education sessions.  (SEC Stip. at 14 ¶ 7).

Pasternak, as CEO of Knight, held ultimate supervisory responsibility.  (SEC Stip. at 16 ¶ 35); (Tr. 2371:7-25); (Exhibit 36 at KN 1265); (Exhibit 37 at 47198).  As a result, between 1995 and 2000, Pasternak regularly interacted with Knight's sales traders and market makers.  (John Stip. at 4 ¶ 10); (Tr. 2364:21-2365:4.  He received and regularly reviewed month-end summary

reports listing each sales trader's gross sales credits and sales per share.  (Defs. Stip. at 7 ¶ 18);

(SEC Stip. at 14 ¶ 14).   In addition, in 1999 and 2000, Pasternak conducted spot-checks of

trading activity conducted by Knight's sales traders, including Joseph.  (John Stip. at 4 ¶ 5);

(Defs. Stip. at 6 ¶ 10); (Tr. 1800:13-1805:1).  Those spot-checks included a review of sales

credits generated by the sales traders on particular trades, considering the volume and price

movement of the particular stock traded.  (Defs. Stip. at 6 ¶ 13); (Tr. 1801:21-1802:13).  In

reviewing trades in 1999 and 2000, Pasternak would note positive or negative sales credits in

excess of $250,000 and $500,000, respectively.  (Defs. Stip. at 6 ¶¶ 11-12); (Tr. 1803:19-

1804:23).

     In 1999 and 2000, Michael Dorsey ("Dorsey") served as Knight's General Counsel.

(SEC Stip. at 16 ¶ 34); (Tr. 2327:1-2).  In October of 1999, Amoruso joined Knight as its Chief

Compliance Officer and operated in Knight's compliance department.  (SEC Stip. at 16 ¶ 34);

(Tr. 2326:12-21).  The compliance department served "to provide oversight over the supervisory

process and controls of the firm, to help develop supervisory procedures, compliance procedures[

and] controls, [and] to insure[ the existence of] an adequate system of checks and balances within

the firm[.]"  (Tr. 2328:7-12, 2369:15- 2370:4).  In addition, the compliance department

"provide[d] advisory assistance" in the form of NASD rule interpretations and guidance to senior

management on potential new businesses.  (Tr. 2328:12-16).

     Knight's compliance department, in 1999 and 2000, consisted of "a number of people

who were former regulators, both at the SEC or the NASD."  (Tr. 2329:4-8).  That department

also employed people who had been employed by Knight for years and understood well both

Knight's business model and the applicable regulations.  (Tr. 2330:7-12).  In addition, to make

the compliance department more accessible to Knight's traders, and to help compliance personnel understand the trading methodology employed by the traders, compliance personnel sat amongst the sales traders and market makers during the day.  (Tr. 2333:24-2334:14).

Amoruso kept abreast of new NASD rules and regulations.  (Tr 2330:17-19).  In particular, Amoruso continually read notices and enforcement cases, attended industry conferences at which compliance issues were discussed, and formed an "informal working group" of compliance directors from large market making firms located in proximity to Knight.  (Tr. 2330:17-2331:12).  That working group, called by its participants as "the Jersey City compliance directors," would regularly discuss industry trends, compliance issues relevant to the market making industry, and policies and practices that most effectively resolve any issues.  (Tr. 2331:3-12, 2332:2-15).

At all relevant times, Knight maintained an updated Compliance and Supervisory Procedures Manual ("Compliance Manual") to provide written procedures and policies to Knight's employees.  (Exhibits 36-38, 602); (Tr. 2335:11-17); (SEC Stip. at 17 ¶ 38).  In 1999 and 2000, Knight's Compliance Manual provided that "[t]he principal function of the Compliance Department is to supervise books and records and all market making, trading and institutional sales activities[.]"  (Exhibit 36 at KN 1283); (Exhibit 37 at 47218); (SEC Stip. at 14 ¶ 10, 17 ¶¶ 39, 46).  As a result, the compliance department, in accordance with the Compliance Manual, was responsible for conducting periodic reviews of a sampling of institutional customer accounts, including discussing the customer and trading activity with the sales traders.  (SEC Stip. at 14 ¶ 12).

To effectuate its goals, the compliance department instituted written guidelines and used

automated systems to aide the department's review of Knight's voluminous trading.  (Tr. 2333:1-21).  The department utilized BRASS to build into the trading system automated protocols that ensured compliance with requirements on order handling, short sales, and trade reporting.  (Tr. 2336:1-16).  In fact, Knight purchased a license to modify BRASS to implement additional controls into its system that were not readily available in the original system.  (Tr. 2336:11-2337:23).  Knight built these compliance processes and protocols around the market makers' accounts through which all trades passed.  (Tr. 2338:3-14).

In addition to the automated controls, the compliance department would manually draw a sampling of trades to ascertain whether the trades complied with the "short sale rule" and whether the order was displayed timely and properly in accordance with order handling rules. (Tr. 2338:15-24).  Knight's compliance department also conducted sampling reviews of order tickets.  (Tr. 2379:20-2380:11).  Notably, Knight's compliance department did not monitor, or impose on any Knight supervisor the obligation to monitor, profits generated on institutional not-held orders.  (SEC Stip. at 17 ¶¶ 40-41); (Tr. 2362:9-2364:10, 2391:12-18).

Believing its procedures to be adequate, the compliance department assured John and Pasternak that its compliance policies and procedures were effective and consistent with NASD rules and regulations.  (Tr. 2342:16-2343:13); (SEC Stip. at 17 ¶ 39).  Amoruso himself attended management meetings at which John and Pasternak were present to discuss any relevant compliance issue.  (Tr. 2361:10-21).  Moreover, Pasternak was positive and supportive of the compliance department and its efforts, and Amoruso felt free to implement procedures he found necessary.  (Tr. 2344:8-20, 1725:5-1726:12, 2041:10-2043:14, 2051:15-2053:3).

D.     **Joseph Leighton's Trading Practices**

Having considered the background of Knight's trading practices and structure, the Court turns to the particular facts surrounding Joseph Leighton's trading practices.  Each sales trader at Knight had their own style and manner of conducting business.  (Tr. 1051:3-7).  A sales trader's tactics would largely depend on his customers and types of stocks traded.  (Tr. 1051:8-12, 1052:8-11).

Significantly, Joseph's particular trading practice involved high-volume, high-priced stocks.  (Tr. 1052:2-7, 1052:21-25, 1688:7-22).  He also held the largest institutional accounts at Knight, (SEC Stip. at 16 ¶ 30); (Tr. 1222:24-25, 1223:9-17, 1795:19-22), and had a reputation of being the trader that took the biggest risks by committing capital, having the most authority to do so, (Tr. 1222:11-23, 1719:20-1720:13).  Indeed, the other sales traders at Knight believed that Joseph's profitability derived from his client base.  (Tr. 1223:1-17).  His clients included: Putnam, Trust, T. Rowe, Delaware, Davis Selected, Fidelity, Dimensional, NV Investments, Capital Guardian Trust Company ("Capital Guardian"), Aesoph Capital Partners, Columbia Management Advisors, Inc. ("Columbia"), Pilgrim, and Keystone.  (Defs. Stip. at 8 ¶ 30).

Not only did Joseph have a coveted list of clients, but he also had a reputation as being a "talented" sales trader.  (Tr. 1718:11-13).  In fact, Levinson described Joseph as being "the most talented sales trader" with whom he had ever worked.  (Tr. 1718:11-13).  Levinson specified that Joseph "had a tremendous understanding of the marketplace, . . . was totally competent about dealing with working . . . orders, with how to get orders[, and h]e was very focused, . . . insightful[,] . . . and phenomenal."  (Tr. 1718:16-23).  Essentially, Joseph applied his understanding of the marketplace to realize opportunities in high-priced, high-volume trades in which he could take risks that other traders would not take.  (Tr. 1719:25-1720:9).

On all of his trades, Joseph's institutional customers "quarterbacked" their orders, (Exhibit 1119 at 36:13-23 (Perry)), monitoring the market, providing specific instructions throughout the transaction, and, in some cases, "doling out" the order—that is, giving Joseph an order in increments.  (Tr. 75:17-76:4, 165:4-20, 309:7-14, 330:21-331:17, 333:2-333:5, 372:21-373:10, 416:21-417:2, 418:5-418:23, 911:14-912:10); (Exhibit 1103 at 47:7-48:18 (Thornton)); (Exhibit 1104 at 86:13-91:5, 108:10-13, 119:15-120:1 (Schubert)); (Exhibit 1105 at 32:17-33:11, 41:18-43:15 (K. Smith)); (SEC Stip. at 15 ¶ 23).  It was common for institutional customers to keep their ultimately sought volume hidden from Joseph; rather, the customers preferred giving the traders "bite-size bits on working orders."  (Exhibit 1103 at 47:7-25 (Thornton)).  Breaking up, or doling out, the orders left control over the trade in the hands of the institutional customer, rather than with Joseph.  (Exhibit 1105 at 32:17-33:11 (K. Smith)).

Because the customers closely monitored the market after placing an order with Joseph, the customers continually communicated with Joseph throughout the execution of the order, and changed their instructions and strategies as the customer deemed appropriate in light of the market conditions.  (Tr. 75:17-76:4, 165:4-20, 309:7-14, 330:21-331:17, 333:2-5, 372:21-373:10, 416:21-417:2, 418:5-23); (Exhibit 1104 at 91:6-10 (Schubert)); (Exhibit 1105 at 42:12-16 (K. Smith)).

Indeed, Joseph's customers found, at the time that they transacted business with Joseph, that Joseph provided them with the best prices and volume in light of their instructions and market conditions.  (Tr. 145:6-23, 325:7-11, 340:6-14, 342:13-19, 411:11-412:13, 413:20-414:5, 415:1-4, 415:17-22); (Exhibit 1113 at 59:25-60:3 (F. Smith)); (Exhibit 1117 at 70:22-71:18, 74:4-75:8, 88:4-13 (Marcotte)); (Exhibit 1104 at 67:6-11 (Schubert)).  None of Joseph's

customers ever lodged a complaint against him for his trading.  (Tr. 2347:24-2348:18).

Generally, the institutional customers found Knight to be at the top of their "go-to list" for

trading in high-volume, high-volatile stocks.  (Exhibit 1104 at 73:6-74:19, 78:1-80:18, 117:6-9

(Schubert)).

Between 1999 and 2000, Joseph generated one of the highest gross sales credits each

month amongst Knight's sales traders.  (Defs. Stip. at 6 ¶ 5); (Exhibits 1-3, 10-11).  In 1999,

seventeen of thirty trades executed through Joseph's sales account generated a gross sales credit

of $250,000 or greater.  (Defs. Stip. at 6 ¶ 14); (Exhibit 9).  In 2000, nine of thirteen trades

executed through Joseph's sales account generated a gross sales credit of $500,000 or greater.

(Defs. Stip. at 6-7 ¶ 16); (Exhibit 9).

Some of Joseph's trading occurred through market making account, # 1002, in which

Pasternak had an economic interest and over which Pasternak exercised decision-making

authority.  (Defs. Stip. at 7 ¶¶ 21-25, at 10 ¶ 47); (Exhibits 13-14).  In 1999, twenty-five of

Joseph's trades executed through market making account # 1002 generated a sales credit of $0.25

or more per share.  (Defs. Stip. at 8 ¶ 28); (Exhibit 13).  That same year, nine of Joseph's trades

executed through that market making account generated a sales credit of $0.50 or more per share.

(Defs. Stip. at 8 ¶ 29); (Exhibit 13).  Five of those nine trades were: (1) an April 15, 1999 trade

of 40,000 EBAY shares on behalf of Fidelity, for which Joseph received a sales credit of $0.50

per share; (2) an April 15, 1999 trade of 25,000 EBAY shares on behalf of Delaware, for which

Joseph received a sales credit of $0.50 per share; (3) a November 23, 1999 trade of 20,797

FDRY shares on behalf of Putnam, for which Joseph received a sales credit of $1.50 per share;

(4) a December 9, 1999 trade of 20,000 LEAF shares on behalf of Aesop Capital Partners, LLC,

for which Joseph received a sales credit of $0.58 per share; and (5) a December 14, 1999 trade of 261,700 SCOC shares on behalf of Columbia, for which Joseph received a sales credit of $0.56 per share.  (Defs. Stip. at 8-9 ¶¶ 31-35).

In 2000, fifty-two of Joseph's trades executed through market making account # 1002 generated a sales credit of $0.25 or more per share.  (Defs. Stip. at 9 ¶ 37); (Exhibit 14).  That same year, twenty-one of Joseph's trades executed through that market making account generated a sales credit of $0.50 or more per share.  (Defs. Stip. at 9 ¶ 38); (Exhibit 14).  Eight of those trades are: (1) a February 11, 2000 trade of 125,000 OPTK shares on behalf of Pilgrim, for which Joseph generated a sales credit of $0.82 per share; (2) a February 14, 2000 trade of 37,200 OPTK shares on behalf of Pilgrim, for which Joseph generated a sales credit of $0.65 per share; (3) a February 28, 2000 trade of 30,700 CDTS shares on behalf of Keystone, for which Joseph generated a sales credit of $0.78 per share; (4) a February 29, 2000 trade of 46,000 OPTK shares on behalf of Pilgrim, for which Joseph generated a sales credit of $0.89 per share; (5) a March 7, 2000 trade of 68,300 FDRY shares on behalf of Trust, for which Joseph generated a sales credit of $1.32 per share; (6) a March 22, 2000 trade of 80,000 OPTK shares on behalf of Pilgrim, for which Joseph generated a sales credit of $0.65 per share; (7) an April 3, 2000 trade of 53,600 CDTS shares on behalf of Keystone, for which Joseph generated a sales credit of $0.54 per share; and (8) a May 30, 2000 trade of 85,000 AUDC shares on behalf of Putnam, for which Joseph generated a sales credit of $0.68 per share.  (Defs. Stip. at 9-10 ¶¶ 39-46).

Joseph executed the following trades:

- a January 8, 1999 trade of 74,700 ATHM shares on behalf of Fidelity, (Defs. Stip. at 11 ¶ 57);

-54-

- a January 15, 1999 trade of 90,000 DBCC shares on behalf of Dimensional, (Defs. Stip. at 11 ¶ 58);

- a January 28, 1999 trade of 82,500 NSOL shares on behalf of Putnam, (Defs. Stip. at 11 ¶ 59);

- a January 29, 1999 trade of 142,000 NSOL shares on behalf of Putnam, (Defs. Stip. at 11 ¶ 60);

- a March 16, 1999 trade of 900,000 COOL shares on behalf of T. Rowe Price, (Defs. Stip. at 11 ¶ 61);

- an April 15, 1999 trade of 400,000 EBAY shares on behalf of Fidelity, (Defs. Stip. at 12 ¶ 80);

- an April 19, 1999 trade of 400,000 NSOL shares on behalf of Putnam, (Defs. Stip. at 11 ¶ 62);

- an April 20, 1999 trade of 817,060 NSOL shares on behalf of Putnam, (Defs. Stip. at 11 ¶ 63);

- an April 21, 1999 trade of 160,000 NSOL shares on behalf of Putnam, (Defs. Stip. at 11 ¶ 64);

- an August 5, 1999 trade of 135,000 YHOO shares on behalf of T. Rowe Price, (Defs. Stip. at 11 ¶ 65);

- a September 20, 1999 trade of 45,000 RAZF shares on behalf of Putnam, (Defs. Stip. at 10 ¶ 51);

- a September 27, 1999 trade of 65,700 ATON shares on behalf of Fidelity, (Defs. Stip. at 11 ¶ 66);

- an October 12, 1999 trade of 210,000 IWOV shares on behalf of Trust, (Defs. Stip. at 11 ¶ 67);

- an October 27, 1999 trade of 25,000 EBAY shares on behalf of Delaware, (Defs. Stip. at 12 ¶ 81);

- a November 8, 1999 trade of 751,250 QCOM shares on behalf of Putnam, (Defs. Stip. at 11 ¶ 68);

- a November 9, 1999 trade of 1,950,000 CHTR shares on behalf of NV Investments, (Defs. Stip. at 12 ¶ 71);

- a November 12, 1999 trade of 479,600 QCOM shares on behalf of Putnam, (Defs. Stip. at 11 ¶ 69);

- a November 15, 1999 trade of 525,310 QCOM shares on behalf of Putnam, (Defs. Stip. at 11 ¶ 70);

- a November 23, 1999 trade of 20,797 FDRY shares on behalf of Putnam, (Defs. Stip. at 12 ¶ 82);

- a December 9, 1999 trade of 20,000 LEAF shares on behalf of Aesop Capital Partners, (Defs. Stip. at 12 ¶ 83);

- a December 13, 1999 trade of 104,050 HBCCA shares on behalf of Trust, (Defs. Stip. at 10 ¶ 52);

- a December 14, 1999 trade of 261,700 SCOC shares on behalf of Columbia, (Defs. Stip. at 12 ¶ 84);

- a December 15, 1999 trade of 30,700 QCOM shares on behalf of Putnam, (Defs. Stip. at 12 ¶ 72);

- a December 21, 1999 trade of 227,500 MYPT shares on behalf of Trust, (Defs. Stip. at 12 ¶ 73);

- a January 18, 2000 trade of 72,700 VPHM shares on behalf of T. Rowe Price, (Defs. Stip. at 10 ¶ 53);

- a February 4, 2000 trade of 181,200 TWAV shares on behalf of Capital Guardian, (Defs. Stip. at 12 ¶ 74);

- a February 11, 2000 trade of 125,000 OPTK shares on behalf of Pilgrim, (Defs. Stip. at 12 ¶ 85);

- a February 14, 2000 trade of 37,200 OPTK shares on behalf of Pilgrim, (Defs. Stip. at 13 ¶ 86);

- a February 28, 2000 trade of 30,700 CDTS shares on behalf of Keystone, (Defs. Stip. at 13 ¶ 87);

- a February 29, 2000 trade of 46,000 OPTK shares on behalf of Pilgrim, (Defs. Stip. at 13 ¶ 88);

- a March 7, 2000 trade of 68,300 FDRY shares on behalf of Trust, (Defs. Stip. at 13 ¶ 89);

- a March 8, 2000 trade of 250,000 CRFH shares on behalf of Fidelity, (Defs. Stip. at 12 ¶ 75);

- a March 16, 2000 trade of 138,800 ETEK shares on behalf of Putnam Investments, (Defs. Stip. at 10 ¶ 54); (Exhibit 1119 at (1/1/9/2006) at 98:3-99:14 (Perry)); (Exhibit 391);

- a March 22, 2000 trade of 80,000 OPTK shares on behalf of Pilgrim, (Defs. Stip.

at 13 ¶ 90);

- an April 3, 2000 trade of 53,600 CDTS shares on behalf of Keystone, (Defs. Stip. at 13 ¶ 91);

- an April 4, 2000 trade of 290,000 AMCC shares on behalf of T. Rowe Price, (Defs. Stip. at 10 ¶ 55);

- an April 4, 2000 trade of 200,000 DIGX shares on behalf of Trust, (Defs. Stip. at 12 ¶ 76);

- a May 24, 2000 trade of 8,000,000 COST shares on behalf of Davis Selected Advisors, (Defs. Stip. at 12 ¶ 77); (Tr. 314:12-315:19, 326:2-339:24, 351:2-352:21, 384:13-388:8, 482:4-484:11, 528:15-535:2, 594:17-600:3, 607:22-608:9);

- a May 30, 2000 trade of 85,000 AUDC shares on behalf of Putnam, (Defs. Stip. at 13 ¶ 92);

- a June 9, 2000 trade of 1,250,000 CTXS shares on behalf of Trust, (Defs. Stip. at 12 ¶ 78);

- a June 30, 2000 trade of 255,000 JNPR shares on behalf of Putnam, (Defs. Stip. at 12 ¶ 79); (Exhibit 1119 at (1/19/2006) 69:3-95:21 (Perry)); (Exhibit 244);

- an August 9, 2000 trade of 150,700 TUTS shares on behalf of Delaware, (Defs. Stip. at 11 ¶ 56); (Exhibit 885); and

- an August 9, 2000 trade of 537,500 SNPS shares on behalf of Fidelity, (Exhibit 1105 at 62:17-64:12, 64:20-66:18 (K. Smith)); (Exhibit 1090).[10]

---

[10]  This trade was not included in the SEC's Amended Complaint as one of the forty-two allegedly fraudulent transactions executed by Joseph.

(Exhibits 10-11).  Notably, on the August 9, 2000 trade on behalf of Fidelity, Joseph printed the

537,500 shares for a volume-weighted average price of $29.6467.  (Exhibit 1090).  That same

day, Fidelity also placed orders for SNPS with six other market making firms.  (Exhibit 1090).

In sum, Fidelity received a total of 482,400 SNPS shares from those other firms.  (Exhibit 1090).

The other firms executed those trades at a combined volume-weighted average price of $29.6545.

(Exhibit 1090).

### E.     The Leightons' Departure from Knight

In the summer of 1999, Pasternak hired Hewitt as President of Knight.  (SEC Stip. at 15 ¶

19); (Tr. 1273:25-1274:12).  At some point later that year, Hewitt and John had a business lunch

together, in which Hewitt had difficulty understanding John's explanation of how Knight

operated and generated profits.  (Tr.  1279:13-1282:14).  At some point during their discussion,

John told Hewitt that John and Joseph earned somewhere between $20,000,000 and $30,000,000.

(Tr. 1281:8-1282:14).  Hewitt's experiences led him to interpret these earnings as improbable,

causing Hewitt to raise concerns over the amount of profits earned.  (Tr. 1282:13-1284:20).  He

raised these concerns with Pasternak.  (Tr. 1282:13-1284:20).  Hewitt told Pasternak that he was

incredulous as to the profits earned by John and Joseph and that he thought, based on his lack of

understanding the trading methodology and the amount of profits generated, the brothers must

have engaged in a form of front-running.  (Tr. 1283:21-1284:14).

In response, Pasternak did not believe that the brothers were front-running, (Tr. 1284:15-

20), but, rather, felt he could have a "marketing problem."  (Tr. 1842:4-1859:24).  Pasternak

thought that Knight could be a target of heightened scrutiny merely because it was profitable;

indeed, Brooks found Knight's profitability caused "envy" among other firms, (Tr. 1851:18-

1852: 23, 170:2-7), and Levinson noted that, once the "bubble" of profitability in the industry

bursted, people might scrutinize Knight for its profitability, (Tr. 1725:8-1726:12). Pasternak

believed that those outside of Knight might perceive Joseph's profitability as the result of

improper trading practices—similar to Hewitt's conclusion, upon learning of Joseph's ability to

earn higher-than-average profits, that Joseph engaged in improper front-running.

Nevertheless, understanding that Hewitt felt he could not work with John, Pasternak

permitted Hewitt to recruit a former colleague, Robert Stellato ("Stellato"), to oversee the entire

institutional sales desk, (Tr. 1285:20-1286:6, 2358:14-2359:1). (SEC Stip. at 15 ¶ 20). Hewitt

also raised his concerns with other people at Knight, including the Board of Directors and

Dorsey, Knight's General Counsel. (Tr. 1282:15-1285:16, 1295:13-1296:19).

Indeed, in December 1999, Pasternak, through Hewitt, offered to Stellato the position of

head of institutional sales. (SEC Stip. at 16 ¶ 33); (Tr. 1289:4-1290:1, 2350:1-17). However,

Stellato did not officially join Knight until early August, 2000. (SEC Stip. at 16 ¶ 33). At that

point, Hewitt assigned to Stellato the task of determining the manner in which Joseph executed

his trades. (Tr. 1290:3-1291:13).

Shortly after his arrival, Stellato, at Pasternak's direction, raised a concern with Amoruso

over the profits Joseph earned on certain institutional orders and indicated that he felt Joseph

could be engaged in front-running. (Tr. 1850:5-16, 2350:1-2351:15). At that point, Amoruso

informed Stellato how NASD rules define front-running, which technically applied only to

options, which Knight did not trade. (Tr. 2351:6-15). Amoruso inquired as to the source of

Stellato's concerns, and, in response, Stellato expressed that, although he could not point to a

particular trade or instance on which to focus, he found, upon review of profit data, that Joseph

made high profits.  (Tr. 2351:23-2352:19).  Amoruso then instructed Stellato to bring to his

attention specific trades executed by Joseph that the compliance department could review, and

notified Dorsey.  (Tr. 2352:25-2353:6).

Shortly thereafter, Stellato presented to Amoruso three spreadsheets reflecting trade runs

in respect of three different securities: SNPS, JNPR, and TUTS.  (Tr. 2353:7-13).  However,

those spreadsheets reflected the profit or cost of the position for either all the buys or all the sells

of the particular stock; the data did not integrate both buys and sells to generate an average cost

position.  (Tr. 2354:20-2355:4).  In any event, Amoruso conducted an in-depth review of those

trades, considering the market conditions at the time Joseph worked the orders, the volume of

both the institutional and retail orders passing through Knight on that day for those stocks, and

the fact that the particular stocks were generally higher-priced stocks.  (Tr. 2355:6-2357:9).

Based on his review, Amoruso concluded that Joseph provided his customers with fair prices.

(Tr. 2355:22-23).  Amoruso found that, considering the aggregate price the customers received

over the course of the day in connection with the market activity, the volume of the order, and the

dollar value of the trade, the prices to the customers were "very good."  (Tr. 2356:5-11).

Amoruso informed Stellato of his conclusion and advised Stellato that, if he was

nonetheless still concerned over Joseph's trading, he could implement additional controls or put

a limit on profits by requiring the sales traders to stop trading on a net basis.  (Tr. 2356:12-

2357:6).  Subsequently, Stellato never sought to add supplemental controls or to limit the sales

traders' profits.  (Tr. 2357:4-9, 2358:4-10).

In August of 2000, Pasternak also independently reviewed Joseph's trading practices,

focusing on the trades in SNPS, JNPR, and TUTS.  (Tr. 1848:22-1867:17, 1870:16-1871:21,

1911:19-1931:3, 1963:11-1966:2, 1968:24-1977:12, 2017:5-2022:17).  Upon receiving the trade

runs produced by Stellato, Pasternak felt that Stellato and Hewitt did not understand the

interactions between the institutional orders and retail order flow or Knight's "opening

guarantee" system.  (Tr. 1850:13-20).  At this point, Pasternak realized that Stellato came from

another firm that neither dealt with interacting retail order flow nor guaranteed liquidity on

automatic retail orders.  (Tr. 1850:22-1851:9).

Nevertheless, Pasternak reviewed the trade runs and spoke with Joseph about his trading

practices.  (Tr. 1852:24-1857:17, 1870:16-1871:21).  Based on his review, Pasternak concluded

that the profits earned by Joseph was part of a marketing problem, rather than the product of

illegal conduct.  (Tr. 1852:24-1857:17, 2023:13-19).  He also consulted with Amoruso and

Dorsey about Joseph's trading, and both Amoruso and Dorsey told Pasternak that they did not

find anything improper in Joseph's trading practices.  (Tr. 2023:20-24).

Pasternak ultimately left the resolution of the issue of Joseph's profits to John, Stellato,

and Hewitt, to the people who supervised the sales desk.  (Tr. 1859:4-20).  He instructed them to

change any procedures and policies they felt would address their concerns, (Tr. 1859:8-11), and

expressed his support for any such changes, (Tr. 1863:19-1864:6).  At that time, Pasternak did

not take affirmative steps in response to the issue, and did not disclose to Knight's customers the

profits Joseph generated on their institutional orders placed with Knight.  (Tr. 1866:25-1867:17).

Prior to and throughout the investigation, John never concealed any information relating to

Joseph's trading activities from Pasternak, Dorsey, or Amoruso.  (SEC Stip. at 17 ¶ 45).

Eventually, Hewitt informed Pasternak that, based on continuing concerns, he wanted the

Leightons terminated, (Tr. 1292:13-1293:14), to which Pasternak agreed, (Tr. 1293:14-1294:16).

(SEC Stip. at 15 ¶ 20).  Indeed, Pasternak and Amoruso observed a clash in management styles

between John and Stellato.  (Tr. 2024:11-2026:25, 2358:14-2359:1).  Once Pasternak expressed

his support of Stellato and Hewitt, the Leightons responded with displeasure and began

considering employment elsewhere.  (Tr. 2024:11-2025:25, 2026:21-2027:20).  On September 7,

2000, the Leighton brothers terminated their relationship with Knight.  (SEC Stip. at 15 ¶ 21);

(Tr. 2024:1-3).

## IV.    CONCLUSIONS OF LAW

Turning now to the Court's conclusions of the law, the Court begins its analysis by

setting forth the elements that the SEC must establish in order to succeed.  Thereafter, the Court

applies the preceding findings of facts to those elements.  First, the Court considers whether

Joseph committed securities fraud.  Second, the Court evaluates whether Defendants themselves

engaged in fraudulent activity for which they could be held primarily liable under the securities

law.  Finally, the Court addresses whether, assuming Joseph violated the various provisions of

the Securities Act and Exchange Act, Defendants may be held secondarily liable for those

violations.

### A.    SEC's Burden of Proof and Requisite Elements

The SEC bears the burden of proving its case by a preponderance of the evidence.

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983).  See *also S.E.C. v. Moran*, 922 F.

Supp. 867, 888-90 (S.D.N.Y. 1996) (discussing at length rationale for applying preponderance

standard and rejecting clear and convincing standard of proof in securities action seeking

monetary and injunctive relief).  Thus, the Court must determine if its findings of fact establish

by a preponderance of the evidence the elements of securities fraud under primary and secondary

liability theories.

### 1.    *Primary Liability*

The Court begins its analysis by setting forth the elements required to establish securities

fraud.  As noted above, Securities Act Section 17(a), Exchange Act Sections 10(b) and

15(c)(1)(A), and Rule 10b-5 all proscribe fraudulent conduct in connection with the purchase

and/or sale of securities.  Based on the similar language of these three statutes and rules, and the

underlying legislative intent, the elements required to prove violations of these statutes and

regulations are essentially the same.  *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d

Cir. 1996) (finding elements of Securities Act Section 17(a) mirror those of Exchange Act

Section 10(b)); *S.E.C. v. George*, 426 F.3d 786, 792 (6th Cir. 2005) (finding Sections 10(b) and

15(c)(1) of Exchange Act require same elements).

Those elements are: (1) the defendant made a misrepresentation, or an omission where

there was a duty to speak, or used a fraudulent device; (2) that misrepresentation or omission was

material; (3) the defendant made the misrepresentation or omission with scienter; (4) the

defendant made the misrepresentation or omission in connection with the sale of a security; and

(5) the defendant made the misrepresentation or omission in connection with interstate commerce

or the mails.  *First Jersey Sec.*, *supra*, 101 F.3d at 1467.  *Accord in re Burlington Coat Factory*

*Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997); *George*, *supra*, 426 F.3d at 792 .[11]  In other

---

[11]  A significant difference in the elements exists if the alleged violation occurs under
Section 17(a)(2) and (3) of the Securities Act.  Under those two provisions, a plaintiff need not
establish scienter.  *First Jersey Sec.*, *supra*, 101 F.3d at 1467 (citing *Aaron v. S.E.C.*, 446 U.S.
680, 701-02 (1980)).  Rather, "[a] violation . . . can be established by a showing of negligence."
*S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 453 (3d Cir. 1997) (citing *Aaron*, *supra*, 446 U.S.
at 701-02).  Although the Amended Complaint does not specify which subsection of Securities
Act Section 17(a) it seeks to invoke, the SEC's briefs submitted during the course of the bench

words, "[t]o prove a violation of § 10(b) and Rule 10b-5, the plaintiff must establish that the

defendant, acting with knowledge or recklessness, made a misrepresentation or omission of a

material fact on which the plaintiff reasonably relied and which resulted in damage." *In re Tyson*

*Foods, Inc.*, 155 Fed. Appx. 53, 56 (3d Cir. 2005) (citing *In re Westinghouse Sec. Litig.*, 90 F.3d

696, 710 (3d Cir. 1996)).

When the plaintiff asserts that the defendant failed to disclose information, the plaintiff

must show the existence of a duty to disclose. *See, e.g.*, *S.E.C. v. Zandford*, 535 U.S. 813, 823

(2002) (finding that "any distinction between omissions and misrepresentations is illusory in the

context of a broker who has a fiduciary duty to her clients"); *Hoxworth v. Blinder, Robinson &*

*Co.*, 903 F.2d 186, 200 n.19 (3d Cir. 1990) ("'Silence, absent a duty to disclose, is not

misleading under Rule 10b-5.'" (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988))).

In addition, an omission is material, meeting the second prong of the inquiry, "if there is a

substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the total mix of information made available."

*Id.* at 200 (internal quotation marks omitted). *Accord Ettinger v. Merrill Lynch, Pierce, Fenner*

*& Smith, Inc.*, 835 F.2d 1031, 1034 (3d Cir. 1987) ("Rule 10b-10 only mandates the disclosure of

information which can generally be expected to be material.").

It has been held that, to impose securities fraud liability for an omission of a "markup,"[12]

_____

trial appear to argue for the application of Section 17(a)(1). *See* SEC Brief in Opposition to
Defendants' Motion to Dismiss at Close of Plaintiff's Case at 3 n.2. For that reason, the Court
applies Section 17(a)(1) here.

[12] A "markup" in the securities fraud context is a term of art. It is defined as the
difference between the price charged to the customer and the prevailing market price. *Grandon
v. Merrill Lynch & Co.*, 147 F.3d 184, 189 (2d Cir. 1998). *Accord First Jersey Sec.*, *supra*, 101

the broker-dealer either (1) was in "a fiduciary relationship with the complaining party" or (2) charged an "excessive" markup. *Press v. Chem. Inv. Serv. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999). *See also Ettinger*, *supra*, 835 F.2d at 1033 (finding that "charging undisclosed excessive commissions constitutes fraud"). To determine the existence of a fiduciary relationship in federal securities fraud actions, district courts generally look to state law. *See, e.g.*, *Press*, *supra*, 166 F.3d at 536 (determining existence of fiduciary relationship under New York law). In New Jersey, then, a fiduciary relationship "arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." *F.G. v. MacDonell*, 150 N.J. 550, 563 (1997).

The Third Circuit has further found that the Supreme Court of New Jersey would likely follow the weight of the authority to hold that a broker is in a fiduciary relationship with a client, where that client maintains an account with the broker in which the broker, not the client, retains discretion. *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 767 (3d Cir. 1990). *Accord Estate of Parr v. Buontempo Ins. Serv.*, 2006 WL 2620504, *4 (N.J. Super. App. Div. Sept. 8, 2006) ( stating that, "[w]hile New Jersey courts do not appear to have directly passed on the issue of whether a fiduciary duty exists when an investment account is discretionary, the clear majority of states hold that a non-discretionary account is necessary to impose a fiduciary duty[,]" and finding no fiduciary relationship where client maintained discretion as to account (citing

---

F.3d at 1469 ("A markup is the difference between the retail price and the 'prevailing market price' of the security."); *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1033 (4th Cir. 1997) ("'A securities broker's mark-up equals the price charged to the customer minus the prevailing market price.'" (quoting *Bank of Lexington & Trust Co. v. Vining-Sparks Sec. Inc.*, 959 F.2d 606, 613 (6th Cir. 1992))). Significantly, a "markup" is not the same as a "profit," which is the difference between the price charged to the customer and the market maker's cost basis for the transaction. *See* NTM 01-85 (December 2001); (Exhibit 87 at 778, "Q. 4.").

*McAdam*, *supra*)).   Significantly, in *Estate of Parr*, the Appellate Division of the New Jersey

Superior Court found that a broker-dealer did not owe a fiduciary duty to a customer because the

broker-dealer did not exercise "control of the account" where the customer made the ultimate

investment decisions.  *Estate of Parr*, *supra*, 2006 WL 2620504 at *4.

      Even in the absence of a fiduciary relationship, a duty to disclose a markup arises if the

markup is "excessive."  *Press*, *supra*, 166 F.3d at 534.  This duty is premised on the notion that

"[s]ales of securities by broker-dealers to their customers carry with them an implied

representation that the prices charged in those transactions are reasonably related to the prices

charged in an open and competitive market."  *First Jersey Sec.*, *supra*, 101 F.3d at 1469.  A

markup "is excessive 'when it bears no reasonable relation to the prevailing market price.'"

*Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 190 (2d Cir. 1998).  *Accord Press*, *supra*, 166

F.3d at 535 (same); *S.E.C. v. Zwick*, 2007 WL 831812, *7 (S.D.N.Y. March 16, 2007) (same);

*Banca Cremi*, *supra*, 132 F.3d at 1033 (same (quoting *Bank of Lexington & Trust Co.*, *supra*, 959

F.2d at 613)); *First Jersey Sec.*, *supra*, 101 F.3d at 1469 (noting that, under NASD rules, "a

reasonable markup is generally not more than 5% over the prevailing market price").

      As a result, a court determining whether a markup is excessive must conduct a fact-

sensitive inquiry.  *Grandon*, *supra*, 147 F.3d at 190.  *See also Banca Cremi*, *supra*, 132 F.3d at

1033 (listing seven factors analyzed to determine reasonableness of markup).  A fact-finder, thus,

must consider various factors, such as: industry practice; nature of services provided; cost of

transaction; expertise of broker-dealer; type and availability of security in the market; market

conditions; and overall risk undertaken by the broker-dealer.  *See, e.g.*, *Press*, *supra*, 166 F.3d at

535; *S.E.C. v. Feminella*, 947 F. Supp. 722, 729 (S.D.N.Y. 1996).

2.     *Secondary Liability*

Having established the analytical framework through which primary liability for violations of securities law may be imposed, the Court next sets forth the general requirements necessary to establish secondary liability, through principles of aiding and abetting and control. First, a plaintiff sustains a claim of aiding and abetting if it establishes:  (1) the existence of a primary violation of the Exchange Act; (2) that the aider-abettor had knowledge of the primary violation; and (3) that the aider-abettor "knowingly and substantially participated in the wrongdoing."  *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978); *S.E.C. v. Lucent Tech. Inc.*, 2005 WL 1206841, *7 (D.N.J. May 20, 2005).

In respect of the knowledge requirement, the SEC argues that different standards exist depending on whether the aider-abettor owed a fiduciary duty to the defrauded party.  In situations in which the aider-abettor is in a fiduciary relationship with the defrauded party, the SEC submits that recklessness satisfies the scienter requirement.  *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575 (2d Cir. 1982).  Recklessness in this instance is "'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *S.E.C. v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006) ("*Kushner*") (quoting *Honeyman v. Hoyt*, 220 F.3d 36, 39 (2d Cir. 2000)).  However, absent a fiduciary relationship, the SEC recognizes that actual knowledge is necessary to establish scienter.  *See, e.g.*, *S.E.C. v. Power*, 525 F. Supp. 2d 415, 422 (S.D.N.Y. 2007) ("There must be a showing of actual intent to defraud when the defendant does not owe a fiduciary duty to the defrauded parties."); *Walck v. Am. Stock Exch., Inc.*, 687

F.2d 778, 791 (3d Cir. 1982) (finding lack of allegation of defendant's actual knowledge of underlying Section 10(b) violation required dismissal of aiding and abetting claim for failure to allege requisite elements); *Monsen*, *supra*, 579 F.2d at 799 ("Knowledge of the underlying violation is a critical element in proof of aiding-abetting liability, for without this requirement financial institutions, brokerage houses, and other such organizations would be virtual insurers of their customers against security law violations.").

Nevertheless, the Court now rejects the SEC's argument that recklessness may satisfy the knowledge requirement for aiding and abetting liability under Section 20(e).  Rather, the Court adopts the holdings of the United States Courts of Appeals for the District of Columbia and for the Ninth Circuit, as well as the United States District Court for the Southern District of New York, and concludes that aiding and abetting liability under Section 20(e) requires a showing of actual knowledge, irrespective of the nature of the relationship between the aider-abettor and the defrauded party.  *S.E.C. v. Johnson*, 530 F. Supp. 2d 325, 332-34 (D.C. Cir. 2008); *S.E.C. v. Fehn*, 97 F.3d 1276, 1287 (9th Cir. 1996); *S.E.C. v. KPMG LLP*, 412 F. Supp. 2d 349, 382-84 (S.D.N.Y. 2006).  Those courts considered both the plain language of the statute—which defines "knowingly" as requiring "actual knowledge," 15 U.S.C. § 78u-4(f)(10)(A)—as well as the legislative history—in which the Senate considered and rejected a proposed amendment to Section 20(e) that would have added recklessness.  *Johnson*, *supra*, 530 F. Supp. 2d at 333; *KPMG LLP*, *supra*, 412 F. Supp. 2d at 382-83 (quoting Senate discussions recognizing that Section 20(e) "effectively eliminates the ability of the SEC to proceed against reckless professional assisters" (internal quotation and editing marks omitted)).

Further, those courts recognized that the Senate passed Section 20(e) in 1995 as part of

the Private Securities Litigation Reform Act ("PSLRA"), in part in response to the decision of

the Supreme Court of the United States in *Central Bank of Denver, N.A. v. First Interstate Bank*

*of Denver, N.A.*, 511 U.S. 164 (1994). *Johnson, supra,* 530 F. Supp. 2d at 332. *Central Bank*

held that "a private plaintiff may not maintain an action for aiding and abetting violations of

Section 10(b) of the Exchange Act, although the SEC may." *Ibid.* Many of the cases which held

that recklessness was sufficient to establish knowledge involved causes of action for aiding and

abetting violations of Exchange Act Section 10(b) brought by private parties, not by the SEC via

Section 20(e); importantly, those cases pre-dated *Central Bank* and the PSLRA. *Walck, supra,*

687 F.2d at 790-91; *Monsen, supra,* 579 F.2d at 796. *Cf. Power,* 525 F. Supp. 2d at 417. As

found by the Southern District of New York, it is unlikely that Congress intended Section 20(e)

to codify existing law prior to the *Central Bank* opinion because the law, prior to the PSLRA,

"was not uniform on the issue of what constituted the requisite scienter for aiding and abetting

liability," and Congress was well-aware of the divergence in the law when it passed Section

20(e). *KPMG LLP, supra,* 412 F. Supp. 2d at 383.

Thus, upon review of the plain language and legislative history of Section 20(e), as well

as the compelling rationales set forth in *Johnson, Fehn,* and *KPMG,* the Court concludes that the

SEC must show that the aider-abettor had actual knowledge of the underlying securities violation

to establish an aiding and abetting claim under Section 20(e). Recklessness, even "extreme

recklessness" in the presence of a fiduciary relationship, is insufficient. *Accord Kushner, supra,*

417 F. Supp. 2d at 334 (holding that "recklessness, even for fiduciaries, is no longer sufficient").

In addition to actual knowledge, the SEC must also show that the aider-abettor

substantially assisted in the underlying fraud. To establish "substantial assistance," a court may

look to various factors to determine if "[s]ome link" exists. *Rubin v. Posner*, 701 F. Supp. 1041, 1048 (D. Del. 1998) (internal quotation marks omitted). Those factors include: "(1) the amount of assistance given by the defendant; (2) the defendant's presence or absence at the time of the tort; (3) the defendant's relation to the other person; and (4) the defendant's state of mind." *Ibid.* (citing *Monsen*, *supra*, 579 F.2d at 800).

Although inaction does not generally rise to "substantial assistance," inaction "may provide a predicate for liability where the plaintiff demonstrates that the aider-abetter [c]onsciously intended to assist in the perpetration of a wrongful act." *Monsen*, *supra*, 579 F.2d at 800. *Accord S.E.C. v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006) ("Inaction on the part of an aider and abettor is not sufficient to satisfy the substantial assistance prong of the standard unless it was designed intentionally to aid the primary fraud or it was in conscious or reckless violation of a duty to act." (internal quotation marks omitted)). Similarly, the United States Court of Appeals for the Second Circuit has held that aiding and abetting liability requires a showing that the defendant's substantial assistance proximately caused the primary violation. *Treadway*, *supra*, 430 F. Supp. 2d at 339 (citing *Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir. 1983)). Consequently, "mere awareness and approval of the primary violation is insufficient to make out a claim for substantial assistance." *Ibid.*

Finally, to impose control liability pursuant to Section 20(a), the SEC must show that: (1) the defendant is a "controlling person[;]" (2) the "controlled person" violated securities law; (3) the defendant "was a culpable participant in the fraud" in that he directly or indirectly induced

the underlying violation;[13] and (4) the defendant did not act in good faith.  *Rochez Bros.*, *supra*, 527 F.2d at 890-91.  Significantly, "[l]iability may be established whether the secondary defendant was directly or indirectly involved in the fraud, and may be premised on inaction, but only if it is apparent that the inaction intentionally furthered the fraud or prevented its discovery[; i]naction alone cannot be a basis for liability."  *Id.* at 890.

Furthermore, under Section 20(a), a defendant may assert an affirmative defense of good faith.  To establish such a defense, "the controlling person [must] show that some precautionary measures were taken to prevent an injury caused" by the controlled person.  *Carpenter v. Harris, Upham & Co.*, 594 F.2d 388, 394 (4th Cir. 1979).  Where the controlling person is a supervisor, it has been noted that, "although the standards of supervision may be stringent, [the duty to supervise] does not create absolute liability for every violation of the securities laws committed by a supervised individual."  *Ibid.*  Rather, "[i]t is required of the controlling person only that he maintain an adequate system of internal control, and that he maintain the system in a diligent manner."  *Ibid.  Accord First Jersey Sec.*, *supra*, 101 F.3d at 1473 ("To meet the burden of establishing good faith, the controlling person must prove that he exercised due care in his supervision of the violator's activities in that he 'maintained and enforced a reasonable and proper system of supervision and internal controls.'"  (quoting *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980)) (internal editing marks omitted)).

The Court now applies these standards to the facts established at trial.  As noted above, throughout the litigation of this matter, the SEC offered varying theories of the fraudulent

---

[13]  *See in re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 392-93 n.179 (S.D.N.Y. 2003) (noting that, although six Courts of Appeals rejected scienter requirement under Section 20(a), Third and Fourth Circuits have held the opposite).

conduct engaged by Joseph and Defendants.  Initially, the SEC alleged that Joseph committed securities fraud by engaging "in a pattern of fraud by trading for institutional customers using a method that concealed" the manner in which Joseph worked the orders and obscured the quality of the price received by the customers.  (Am. Cmplt. ¶ 18).  Later, the SEC argued that this pattern of trading included improper front-running, whereby Joseph, holding an institutional order, would take a position in the ordered security and delay the execution of the order to take advantage of fluctuating market conditions, with the ultimate goal of generating profits for himself and Knight.

Another theory of liability espoused by the SEC is that Defendants, in their supervisory capacities, owed an independent fiduciary obligation to disclose to Knight's institutional customers Joseph's profits, and the failure to so inform the customers breached their fiduciary duties.  In respect of liability against Pasternak, the SEC contends that Pasternak made a false and misleading statement by signing Knight's Form 10-Ks in 1999 and 2000, which stated that Knight provided its customers with best execution.  To further establish liability against John, the SEC underscores John's familial relationship with, and direct supervision of, Joseph, and John's joint compensation agreement with Joseph.

Notwithstanding the various theories through which the SEC seeks to impose liability, the Court finds that, necessarily, the threshold inquiry is whether the SEC has proven that Joseph committed securities fraud.  If the SEC failed to prove an underlying securities fraud by Joseph, then the SEC cannot impose liability, either primarily or secondarily, against John and Pasternak.  However, if the SEC has proven a securities fraud by Joseph, then the Court must determine if the SEC also established primary or secondary liability on the part of John or Pasternak.

**B.      Underlying Securities Fraud by Joseph**

The SEC contends that it has proven, by a preponderance of the evidence, that Joseph committed securities fraud.  In so arguing, the SEC submits that it established the existence of fraudulent and manipulative conduct by showing that: (1) Joseph earned "excessive" profits; (2) Joseph charged its customers an undisclosed mark-up; (3) Joseph used the institutional orders to manipulate his trading tactics in a manner to garner profits for himself and the firm, which amounts to an improper form of front-running; and (4) Joseph did not properly report trades to the NASDAQ tape by using, in a manipulative way, ACT modifiers.  The Court addresses each allegation in turn.

**1.      *Excessive Profits***

Throughout the trial, the SEC characterized the profits earned by Joseph and Knight as "excessive," "outrageous," "egregious," "unreasonable," and "obscene."  To support its claim, the SEC proffered evidence as to Joseph's sales credits received in 1999 and 2000 and Dr. Levy's calculations of Joseph's profits.  The SEC also stipulated that Knight, in its 2000 SEC Form 10-Q, represented that it's "'net trading revenue increased 152% . . . for the months ended March 31, 2000 . . . for the comparable period in 1999[.']"  (SEC Stip. at 14 ¶ 1).

Significantly, the SEC did not present the Court with any proof that a statute, rule, regulation, or industry standard limits a market maker's profits, nor did it proffer an expert in the industry who could attest as to some standard guideline by which the Court could determine excessiveness.  Prior to trial, however, the SEC did stipulate that two other market making firms represented a 140% revenue increase for the period of December 1999 to February 2000 as compared to that period in 1999, and a 163% revenue increase for the quarter ending April 30,

-74-

2000 compared to the 1999 quarter ending April 30, 1999.  (SEC Stip. at 14-15 ¶¶ 16-17).  Apart from those stipulations, no evidence established the amount of profits earned by other market making firms engaged in NASDAQ trading during the volatile period of 1999 and 2000.

Initially, the Court rejects the SEC's contention that Joseph's sales credits necessarily equal his profits.  All Knight-associated witnesses testified that sales credits were a negotiated allocation of the overall P&L on a particular stock to an institutional order transacted by the sales trader.  Without a doubt, the calculation of a particular sales credit was not an exact science. Various subjective factors worked together to calculate a sales credit, and those variable factors did not fit neatly into a specific formula.  The Court, thus, concludes that Joseph's sales credits do not equal his profits earned on the trades.  Rather, Knight's sales credits were an internal accounting mechanism and, at a maximum, indicate the general concept of profitability.

Nevertheless, turning to the argument that Joseph earned "excessive" profits, the Court recognizes that case law exists discussing excessive *mark-ups*.  *See, e.g.*, *Grandon*, *supra*, 147 F.3d at 189; *First Jersey Sec.*, *supra*, 101 F.3d at 1469.  Those cases express that a mark-up is excessive if it bears no reasonable relationship to the existing market conditions.  *See Grandon*, *supra*, 147 F.3d at 190; *Press*, *supra*, 166 F.3d at 535; *Zwick*, *supra*, 2007 WL 831812 at *7; *Banca Cremi*, *supra*, 132 F.3d at 1033; *First Jersey Sec.*, *supra*, 101 F.3d at 1469.  However, the term mark-up is not synonymous for profit.  *See* Supra IV.A.1. at n.10.  Similarly, an imputed commission and a fee are not the same as a profit.  A profit on a trade could include a charged mark-up, commission, or fee, but it could also include sums properly earned by committing capital or holding a position in a stock on the customer's behalf.

Considering the lack of evidence submitted, the Court finds that there was nothing

fraudulent in the ability of Joseph and Knight to garner a certain sum in profits.  The evidence does not suggest that Joseph's, or Knight's, profits were not reasonably related to existing market conditions.  Indeed, Joseph and Knight earned these profits during a highly volatile period where Knight's business model was built to take advantage of high-volume trading in volatile stocks. Joseph had a reputation as a "talented" sales trader who would take risks where others would not. Thus, it is not surprising that a talented sales trader, taking risks with high-priced, high-volume, and volatile stocks in a business that sought to be the "next-generation" market making firm was able to generate profits in such a dynamic atmosphere.

In addition, the facts presented do not suggest that Knight was the highest-earning market maker in that time period.  Knight's reported revenue increase in March 2000 was 152%—eleven percent lower than the revenue increase at M.H. Meyerson & Co., Inc. reported in April 30, 2000. Also, Joseph was not the only Knight sales trader to earn above average sales credits.  (Exhibit 1- 3).  Those sales traders who handled high-priced, highly-volatile securities, and who had a reputation of taking risks on trades, generally garnered higher sales credits.  Furthermore, no rule, regulation, or standard, either at the time the allegedly fraudulent conduct occurred or presently, limits a market making firm's profit.

Therefore, the Court concludes that there is nothing improper in the amount of profits earned by Joseph or Knight—notwithstanding the dearth of evidence reflecting the actual amount of profits earned by Joseph.  In addition, the Court rejects the SEC's argument that Joseph's profits—assuming the profits exceeded some unknown standard average—necessarily indicate that Joseph engaged in fraudulent or manipulative conduct in violation of the securities laws.  As noted above, the 1999-2000 period in the NASDAQ market was one of "mania" and volatility.

Indeed, it was an opportunity for businesses, such as Knight, and talented traders, such as Joseph, to take advantage of converging events—increased volume, unprecedented volatility, and technological advances.  Essentially, the Court finds that the SEC's *res ipsa loquitor* theory as to Joseph's profits must fail.

### 2.   *Failure to Disclose Mark-Ups*

The SEC also alleges that Joseph improperly charged his institutional customers an undisclosed excessive mark-up.  Securities fraud exists where a broker-dealer fails to disclose a mark-up if the broker-dealer was in a fiduciary relationship with the customer or if the broker-dealer charged an "excessive" mark-up.  To support its claim, the SEC points to Knight's sales credit data, which reflected the sales credit per share earned by its traders on a monthly basis.  According to the SEC, the sales credit per share equates to a mark-up charged by Joseph on his institutional orders.  The SEC further argues that the charged mark-ups can be calculated by subtracting Knight's cost of acquiring a position on a particular trade from the price Knight executed that trade to the customer.

As a threshold matter, the Court rejects the concept that Joseph charged an identifiable mark-up.  First, the types of orders handled by Joseph do not generally involve mark-ups, commissions, or fees.  Joseph handled not-held orders executed on a net basis.  By definition, those trades do not include set mark-ups, commissions, or fees.  Second, Joseph's recorded sales credits earned per share do not equal or reflect a charged mark-up passed on to his customers.  As noted in the above section, sales credits are the result of an internal accounting mechanism, reflecting the effect of an institutional order on a market maker's P&L obtained for a specific stock.  The fact that Joseph earned a particular sales credit per share for an institutional order he

handled bears minimal relationship to a hypothetical mark-up on that order.

Finally, the SEC incorrectly suggests that a charged mark-up may be calculated as the difference between Knight's cost basis in a trade and the price executed to the customer. As noted previously, a mark-up is a term of art in the securities industry. It is clearly defined as the difference between the price charged to the customer and *the prevailing market price*—not the price at which a market maker acquires the position for the customer. *See, e.g.*, *Grandon*, *supra*, 147 F.3d at 189. For those reasons, the Court concludes that the SEC has not established that Joseph charged any mark-up, let alone one that is excessive, on the institutional orders that he handled in 1999 and 2000.

Nevertheless, assuming that Joseph did charge an identifiable mark-up on his trades, the Court further concludes that the SEC has failed to prove that Joseph had an obligation to disclose those mark-ups. The duty to disclose a mark-up arises in two limited instances: first, where a fiduciary relationship exists between the broker-dealer and the customer; and second, where the charged mark-up is "excessive." Neither of these instances applies to the facts in this case.

Joseph did not owe a fiduciary obligation to his institutional customers. The crux of a fiduciary relationship is the relinquishment of control and discretion by the customer. *See McAdam*, *supra*, 896 F.2d at 767. Here, Joseph's customers purposefully did not relinquish control over their orders. All of Knight's customers testified that they would break up, or dole out, their orders to maintain control over the trade. Importantly, Joseph's customers themselves owed fiduciary obligations to their clients; thus, these institutional customers could not potentially violate their duties by abdicating all discretion to a market maker. The fact that Joseph could exercise discretion as to time and price on a not-held order does not necessitate a

finding of a fiduciary relationship, particularly in light of Joseph's limitations posed by his customers' specific instructions.  As a result, the Court concludes that Joseph and his institutional customers were not in a fiduciary relationship.  Thus, Joseph did not breach any fiduciary obligation to disclose an alleged mark-up.

In addition, Joseph did not have a similar disclosure obligation based on the fact that the mark-ups were excessive.  A mark-up is excessive if it "bears no reasonable relation to the prevailing market price." *Grandon*, *supra*, 147 F.3d at 190 (internal quotation marks omitted). The Court notes that there is a lack of evidence through which it could ascertain the prevailing market price for the forty-two trades Joseph executed in 1999 and 2000 that the SEC raises in its Amended Complaint.

The Court did receive evidence regarding an August 9, 2000 trade in SNPS shares executed by Joseph on behalf of Fidelity—a trade not included in the Amended Complaint. (Exhibit 1090).  That exhibit indicates that Knight executed its trade to Fidelity at an average price below the average price charged by six other market making firms.  Thus, only one piece of evidence, which related to a trade not included in the Complaint or Amended Complaint, provides the Court with any indication as to how Knight's prices—significantly, not mark-ups, as the Court received absolute no evidence as to charged mark-ups— compared to other prices in the marketplace; and that evidence tends to prove that Knight's prices were consistent with prevailing market prices.  The sole piece of evidence on the issue refutes the SEC's position.

The Court further rejects the SEC's argument that the evidence submitted suggests the existence of an industry standard requiring a mark-up on all trades of between a few cents and an eighth of one dollar.  Significantly, no rule or regulation set that standard, and the witnesses who

testified as to that alleged industry standard explained that it was a rule applicable in the New York Stock Exchange that NASDAQ members utilized in the absence of a NASD rule.  Rather, NASD guidelines appear to permit discretion as to how a market maker generates income.  NTM 01-85 (December 2001); (Exhibit 87).  Accordingly, the Court finds that the SEC has not met its burden of proof to establish by any evidence, let alone by a preponderance of the evidence, that Joseph charged an excessive mark-up or a mark-up exceeding some industry norm.

As a result, the Court concludes that Joseph did not have an obligation to disclose hypothetical mark-ups to his customers either because he owed a fiduciary duty to those customers or because the mark-ups were excessive.  Furthermore, the Court emphasizes that the orders placed with Joseph were not-held orders for net trades that did not include an identifiable mark-up.  Moreover, the standard practice in the industry during the relevant time period was to not disclose or inquire into a market maker's profits on net trades.  Thus, Joseph did not commit securities fraud by failing to disclose mark-ups on his trades.

### 3.    *Front-Running*

The SEC's next theory of securities fraud is that Joseph manipulated not-held orders to his advantage and to the disadvantage of his customers.  The SEC alleges that Joseph engaged in front-running.  The Commission argues that Joseph received an institutional order, and had the market maker acquire a certain position pursuant to the order, but delayed execution, or printing, of the complete order to the customer.  Through that manner, the SEC alleges, Joseph was able to take advantage of market conditions to fill the order at a price substantially higher than Knight's cost to establish the position, thereby creating a higher spread.  According to the SEC, this conduct is a fraudulent device in violation of the securities laws.  The Court disagrees.

First, this manner of trading does not fit the NASD's definition of prohibited front-running as set forth in IM-2110-3.  IM-2110-3; (Exhibit 1024).  Second, the pure essence of a not-held order is to allow a sales trader, such as Joseph, to monitor the market and various conditions and to exercise his discretion to determine when to print to the customer.  In exercising that discretion, a sales trader is held to only two requirements: to use reasonable diligence to provide best execution and, if committing capital on the order, to execute at a fair price.  NASD Rules 2320, 2440; (Exhibits 89, 944).  As part of the best execution requirement, the NASD has expressed that a sales trader may, "if necessary to fill the entire order at an acceptable price, trade ahead of the institutional customer's order."  NTM 97-57 (Sept. 1997); (Exhibit 84 at 460, "Question 8").  Further, the discretion granted in a not-held order "means that the firm may trade at the same price or at a better price than that received by the discretionary order."  NTM 97-57 (Sept. 1997); (Exhibit 84 at 460, "Answer 8").  A not-held working order, thus, necessarily requires the sales trader to manipulate the execution of the trades to arrive at best execution for the customer.

Furthermore, as explained by Cangiano, best execution obligations could be divided into two categories: (1) "plain vanilla," or simple, best execution; and (2) sophisticated best execution.  Plain vanilla best execution occurs where an order for a small amount of shares is executed immediately at the best available price, which must be inside the national best bid and offer price for that stock.  This type of best execution applies to market or limit orders.  In contrast, sophisticated best execution applies to not-held orders for high-volume, volatile stock.  To satisfy the sophisticated best execution requirement, a sales trader must use his best efforts to fill the order at the best price in accordance with NASD Rule 2320.  Joseph's trades fall in the

category of sophisticated best execution.

Whether a sales trader uses reasonable diligence to provide best execution or executes a trade at a fair price requires a fact-sensitive inquiry.  The Court must consider the type of security traded, including its price, volatility, and liquidity, the size of the transaction, the market conditions existent at the time of the transaction, the instructions given by the customer, and the prices offered by other market making firms.  However, the SEC has not proffered sufficient evidence as to these factors, with the exception of possibly three trades: (1) a March 16, 2000 trade of ETEK shares on behalf of Putnam; (2) a May 24, 2000 trade of COST shares on behalf of Davis Selected; and (3) a June 30, 2000 trade of JNPR shares on behalf of Putnam.  The SEC provided evidence of Putnam's instructions to Joseph on the ETEK and COST trades though Perry's testimony, (Exhibits 244, 391), and of the market conditions and volatility of the COST trade through Lawlor's testimony.

Notwithstanding the lack of evidence as to the various factors that determine if a sales trader offers best execution, the Court emphasizes that Joseph's customers all testified that, at the time of the transactions, they believed they received best execution and fair prices on their trades. No institutional customer testified that Joseph executed a trade that was not reasonably related to market conditions.  In fact, the institutional customers never complained about the price paid or received for a trade executed through Joseph.  Contemporaneous with Joseph's executions, the institutional customers had knowledge as to all of the various factors that contribute to the determination of whether a sales trader provided best execution; the customers knew: the market conditions for the particular stock; the type and volume of the order; their strategy goals for the trade; their instructions to Joseph; and the prices offered, if any, by other market making firms

via AutEx.  Joseph's customers, thus, were in the best position to determine if Joseph provided best execution.

The Court further underscores the testimony by Joseph's institutional customers that they doled out the orders to Joseph, giving him only portions of the ultimate order sought.  Based on this custom, it is not surprising that a talented trader such as Joseph might anticipate that one order by an institutional customer could be immediately followed by subsequent larger orders.  It is not unreasonable or improper for Joseph or the market maker handling the order to take a position on behalf of Knight in anticipation of fulfilling a future additional order.

Furthermore, these trades did not occur in a vacuum.  Rather, Joseph operated through the "next generation" market making firm, and at the intersection of extraordinary factors: unprecedented volatility; the internet bubble; and the "democratization" of individual investors.  The Court then must consider Joseph's trading practices in light of the general market conditions in 1999 and 2000 and Knight's business model—in which high-volume retail order flow interacted with positions acquired to fill institutional orders, and which provided automatic executions and opening guarantees.

Indeed, market conditions dictated Knight's capital commitments and the manner in which it executed institutional orders.  For example, Knight's retail order flow included buy and sell orders.  If those orders depleted Knight's inventory of a particular stock, then Knight might have to commit its capital to acquire positions to fill an institutional order.  The depletion of an inventory by retail order flow and automatic executions could also dictate the timing of executions to fill an institutional order; such an event is not within Joseph's abilities to manipulate.  Significantly, any profit generated due to Knight's own capital commitments, where

it places itself at risk, rightly belongs to Knight, not to its institutional customers.

Considering both the evidence presented and the lack of evidence, the Court concludes that the SEC failed to establish by a preponderance of the evidence that Joseph manipulated his trading tactics in a manner that amounted to a fraudulent device in violation of federal securities laws. The Court emphasizes that the evidence does not establish that certain positions taken by Knight were positions taken for the purpose of filling a customer order placed through Joseph, or that Joseph's delayed printing to the customer was neither part of the customer's instructions nor in furtherance of his best execution requirement. In addition, the weight of the testimony proffered establishes that Joseph was a talented and reliable trader; his assistants, Miller and Mitrano, both attested that, to their knowledge, Joseph never lied to his customers, but, rather, always sought to seek his customer's best interests. A focal point in improper front-running is that the conduct is to the detriment of the customer; here, the Court cannot say the customers did not benefit from Joseph's conduct.

Furthermore, the fact that Joseph might have garnered "excessive" profits does not indicate that he must have been engaged in improper conduct. The Court disagrees with the logical leap taken by both the SEC and Hewitt. Hewitt's conclusion that Joseph "must" be front-running was based solely on his lack of understanding as to how Joseph and John earned their profits. Importantly, evidence presented at trial questioned Hewitt's belief as to the amount of profits actually earned by Joseph and John. In addition, Hewitt himself testified that, based on his traditional market making background, he failed to comprehend how Knight dealt with high-volume retail order flow that interacted with the institutional orders; Hewitt did not grasp the business model behind the next generation market maker. It also became apparent at trial that

-84-

Hewitt had a personal dispute with Joseph and John that continued from 1999 until the present.

Significantly, although Hewitt testified that he believed Joseph to be engaged in front-running, he never reviewed Joseph's trading records, spoke with Joseph's customers, or disclosed Joseph's profits to anyone outside of Knight.  Rather, Hewitt accepted the opinion of Dorsey, Amoruso, and Knight's Board of Directors that Joseph did nothing improper, and continued to benefit from Joseph's profitable trading by collecting from the management bonus pool.  Hewitt, essentially, criticizes Pasternak and John for failing to take steps that he chose not to take.

For those reasons, the Court concludes that Joseph did not engage in illegal front-running, as defined by the SEC and, thus, did not use a fraudulent or manipulative device in contravention of the Securities Act or the Exchange Act.

### 4. *Improper Use of ACT Modifiers*

Finally, the SEC argues that Joseph, and other unnamed Knight sales traders, misused ACT modifiers when printing to their customers.  The SEC submits that this misuse was part of Joseph's manipulation of the trades to obscure the quality of the execution prices.  In addition, the SEC contends that this misuse violates the reporting requirements imposed in Section 17(a)(1) of the Exchange Act and Rule 17a-3.

The SEC provided minimal evidence as to the use of ACT modifiers.  The Commission proffered Miller and Mitrano to testify as to their use of the modifiers in aiding Joseph to print transactions.  However, their testimony contradicts the SEC's theory of improper use of ACT modifiers.  First, both assistants testified that Joseph never instructed them to misuse a modifier.  Second, Miller testified that the compliance department instructed him on the proper use of

modifiers.  Absent any proofs that Joseph, or Knight's traders, misused ACT modifiers, the SEC cannot establish that such misuse was part of a fraudulent manipulation or a violation of statutory reporting requirements.

### 5.    *Joseph Did Not Violate a Securities Law*

In conclusion, the Court finds that the SEC failed to meet its burden of proof to establish that Joseph violated any section of the Securities Act or the Exchange Act.  It appears to the Court that the crux of the SEC's allegations is that Joseph, and Knight, garnered large profits.  In hindsight, the institutional customers may be upset that they might have executed a trade at a cost lower than what they received, or even lower than general market conditions.  However, Knight is in the business of earning a profit.  It is entitled to both earn profits and be successful in its business, especially where it places itself at risk for the sake of its customers.  Moreover, the Court underscores that Joseph was not the only sales trader at Knight to earn higher-than-average sales credits.  (Exhibits 1-3).  Nevertheless, the SEC alleges that only his conduct was fraudulent.

Assuming that Joseph's sales credits do equal his profits or mark-ups, the SEC has not proven that Joseph is liable for securities fraud simply because the hand-picked forty-two of his innumerable trades generated "profits" exceeding $0.12 per share.  Reviewing Exhibits 531 and 532, the Court finds that the majority of Joseph's trades garnered "profits" less than $0.12 per share.  (Exhibits 531-32).  The fact that Joseph recovered higher-than-average profits on a small percentage of his overall trading is not indicative that he generated excessive profits, charged an excessive mark-up, or engaged in a pattern of fraudulent conduct.

No rule or regulation promulgated by the SEC or the NASD, either in the 1999-2000 period or presently, limits the profit earned on a trade executed for a not-held order or prohibits a

form of front-running that the SEC alleges in this case.  The only exception is the 5% Rule, which provides a general guideline that may be considered as one factor among others, such as market conditions and volume and volatility of the ordered trade.  The SEC and the NASD have the authority to implement rules and regulations they deem proper and necessary; however, neither regulatory body issued any such rule or regulation prohibiting the conduct complained of in this action.  Essentially, the SEC urges the Court to impose rules where it declined to do so.

The Court, therefore, concludes that the SEC failed to prove by a preponderance of the evidence that Joseph made a misrepresentation, an omission where he had a duty to speak, or used a fraudulent device.  *See First Jersey Sec.*, *supra*, 101 F.3d at 1467.  Joseph did not commit securities fraud by earning "excessive" profits, failing to disclose a hypothetical mark-up—a term of art repeatedly improperly used by the SEC—engaging in a manipulative device, or improperly using ACT modifiers.  Because the SEC has not proven the existence of a securities law violation against Joseph, the SEC's claims against Defendants, both on theories of primary and secondary liability, must fail.

### C.    Primary Liability Against Defendants

Although the Court concludes that the manner in which Joseph executed the trades on behalf of his institutional clients was not fraudulent or manipulative, rising to the level of securities fraud, the Court nevertheless considers whether, assuming Joseph did engage in securities fraud, the SEC has established primarily liability against Defendants.  In this consideration, the Court grants the SEC any favorable inference that may be drawn from the findings of facts established at trial.

To establish that John and Pasternak committed securities fraud in violation of the

Securities Act and the Exchange Act, the SEC must have shown that John and Pasternak made a misrepresentation or an omission where there was a duty to speak, or used a fraudulent device. The SEC attempts to meet this element by arguing that Defendants made misrepresentations that Knight offered best execution to its customers.  In addition, the SEC claims that Defendants owed a duty to disclose Joseph's profits based on their independent fiduciary obligations owed to Knight's customers.

### 1.  *Affirmative Misrepresentations*

The SEC argues that Defendants misrepresented to its customers and the public that Knight offered best execution in accordance with NASD rules.  However, the only proofs as to these alleged misrepresentations are found in Exhibits 81 and 82: Knight's SEC Form 10-Ks filed in 1999 and 2000.  (Exhibits 81-82).  In the sections regarding the overview of Knight's business, Knight's Board of Directors, including Pasternak, represent that Knight provides best execution through its "proprietary trading methodology and sophisticated trading systems." (Exhibit 81 at 04966); (Exhibit 82 at 04978).  Notably, the SEC did not furnish any proof that John made any such representation.

Indeed, the Form 10-K is an important document and its signatories may be held accountable for misrepresentations made therein.  However, in this case, the SEC has not established that Knight did not provide best execution to its customers or that, assuming Joseph did not provide best execution, Pasternak knew or should have known of the falsity of the statements in the Form 10-Ks.  The SEC bore the burden of establishing that Pasternak made that misrepresentation with knowledge or recklessness.  *See in re Burlington Coat Factory Sec. Litig.*, *supra*, 114 F.3d at 1417.  The SEC has not met that burden.

As a threshold matter, the Court concludes that the SEC did not prove by a preponderance of the evidence that Knight did not provide best execution.  Knight's customers were satisfied with Knight and Joseph.  They testified that they believed, at the time of the trades, that Knight and Joseph provided them with the best execution, and price, available in the marketplace.  However, assuming that the statement that Knight provides best execution is both a misrepresentation and material, Pasternak did not know nor have reason to know of the falsity of the statement.  First, Pasternak knew that Joseph's customers complimented both Joseph and Knight for its ability to trade high-priced, high-volume, volatile stocks.  Second, Pasternak had numerous obligations as CEO and Chairman of the Board of Directors that kept him from knowing every movement within Knight.  Third, the fact that Pasternak held a market making account through which Joseph executed some trades does not indicate that Pasternak knew or should have known that Joseph did something improper.  The SEC offered no proof that Pasternak himself actually executed those trades in account # 1002.  Rather, the proofs show that Pasternak reviewed the trading in that market making account and, upon his review, found nothing improper.

Furthermore, Pasternak reviewed Joseph's trade runs as part of his overall supervisory role; the fact that Joseph earned higher-than-average profits, in and of themselves, did not put Pasternak on notice that Joseph was violating any securities law.  In addition, when Hewitt and Stellato presented the possibility that Joseph could be engaged in front-running, Pasternak took all necessary steps to resolve the issue.  He informed the compliance and legal departments—Amoruso and Dorsey—and investigated the trade runs presented by Stellato.  After concluding himself and considering the conclusions of Dorsey and Amoruso that Joseph

did nothing improper, Pasternak, nonetheless, informed Hewitt and Stellato that they may institute policy and procedure changes they felt necessary to resolve any remaining issue as to Joseph's trading practices.  Significantly, neither Hewitt nor Stellato made any changes.

Considering all of the facts presented, the Court finds that nothing in record indicates that Pasternak knew, should have known, or was reckless in not knowing that Joseph violated a securities law, assuming there was such a violation.  Moreover, the Court reiterates that Pasternak's discussion of a "marketing problem" as to Joseph's profits does not indicate knowledge of improper trading.  Rather, the "marketing problem" was Pasternak's recognition that Knight's profitability generated "envy" among other industry firms and had the potential to cause a perception that the profits were the result of improper or sharp business practices.  The SEC's own witnesses, Brooks and Levinson, support this concept.

Accordingly, the SEC has failed to show that either John or Pasternak made a material misrepresentation or even that Defendants knowingly or recklessly made any misrepresentation.

### 2.    *Failure to Disclose*

To further support its theory of primary liability against Defendants, the SEC argues that Defendants owed an obligation to disclose Joseph's profits, knew or were reckless in not knowing that Joseph garnered "excessive" profits, and failed to make any such disclosure.  The SEC further claims that Defendants' obligation to disclose arises from their fiduciary relationship with the institutional customers and from the "excessiveness" of Joseph's profits.

Assuming Defendants had a duty to disclose profits, Defendants did not act with the requisite scienter in failing to disclose.  The Court first concludes that Defendants did not have actual knowledge of any improper conduct on the part of Joseph.  Next, the Court finds that the

-90-

SEC has not provided the Court with any evidence as to recklessness; the SEC did not proffer

any expert witness to attest to the proper standards a supervisor in a market making firm should

follow.  Thus, there are no standards by which the Court could judge the actions of Defendants in

their supervisory capacity.

In respect of John, the SEC has not shown that John acted with the requisite scienter in

failing to disclose Joseph's profits.  It appears that the SEC seeks to establish scienter on the part

of John by pointing, in part, to his familial relationship with Joseph and the profit-sharing

agreement between the two.  However, the Court rejects the SEC's argument that the income-

sharing agreement was improper in any way.  Significantly, no witness testified that such an

agreement is improper *per se* in the securities industry; rather, Cangiano, Amoruso, and

Pasternak testified that such agreements were not uncommon between supervisors and traders.  In

fact, the SEC recognized in its stipulated facts that the agreement between John and Joseph was

in recognition of John having given Joseph his book of clients, which included highly-coveted

institutions.  Indeed, John had cultivated a relationship with those customers, and Joseph

benefitted from John's efforts.  Nevertheless, Pasternak terminated that arrangement in March of

2000.  The witnesses also established that it was not uncommon in the industry for family

members to supervise each other.  Thus, the SEC cannot establish scienter against John based on

his familial relationship and profit-sharing agreement with Joseph.

John did not knowingly or recklessly fail to disclose Joseph's profits.  First, the SEC's

fact witnesses established that the industry standard in 1999 and 2000 was not to disclose profits

earned on a trade.  Second, John regularly reviewed Joseph's trade runs and, considering the

market conditions and type of trades conducted, found nothing improper.  Indeed, Miller and

Mitrano testified that John was "anal" about having traders and assistants properly complete

order tickets.  Third, John's knowledge that Joseph generated high profits or sales credits did not

trigger any obligation to further investigate his trades, especially in light of the market conditions

at the time, Joseph's trading capabilities, Joseph's customers, and the fact that other sales traders

earned equal or greater profits or sales credits.  Finally, no evidence indicated that John knew or

should have known of some hypothetical industry standard as to a limit on profits, or of the fact

that Joseph's profitability exceeded that of sales traders at other market making firms.

The SEC has not presented any evidence as to how John should have responded to the

fact that Joseph earned a certain level of profits.  The SEC failed to establish that John deviated

from a standard of care applicable to a supervisor of a sales trader in the market making industry

during 1999 and 2000.  As noted above, no expert testimony was presented as to the standard of

care applicable in this case.  As a result, the Court adjudges John's conduct based on the weight

of the evidence and applicable case law.  Conducting such an analysis, the Court finds that the

SEC presented no evidence tending to show any improper conduct on the part of John.

In respect of Pasternak, the Court similarly finds that the SEC failed to show that

Pasternak acted with the requisite scienter in failing to disclose Joseph's profits.  The Court

reiterates here the same rationale as expressed above detailing the SEC's failure to prove scienter

in terms of Pasternak's alleged misrepresentation.  The Court emphasizes that, Pasternak,

although knowing Joseph's sales credits and profitability, had no reason to believe that such

profits were improper or even "excessive."  Furthermore, testimony presented establishes that the

familial and economic relationship between Joseph and John did not raise a "red flag," or

concern that Joseph or John could be violating the securities law.  Thus, Pasternak did not know,

nor should he have known, that the profitability and sales credits attributable to Joseph indicated improper conduct.

As to recklessness, the SEC did not present any evidence tending to indicate a proper standard of care that Pasternak failed to follow. Reviewing the evidence before the Court, it is apparent that Pasternak took all necessary steps to ensure compliance with federal securities law. He aptly relied on his compliance and legal departments and supported any changes management at Knight felt would prevent a compliance issue.

As a result, the Court concludes that, assuming Defendants owed an obligation to disclose, Defendants did not knowingly or recklessly fail to make any required disclosure.

### 3.    *Defendants Did Not Violate a Securities Law*

The Court concludes that the SEC failed to establish that Defendants violated the Securities Act or the Exchange Act such that they may be held primarily liable. The Court underscores that the SEC proffered absolutely no evidence as to any standard that either John or Pasternak should have followed but failed to do so. Accordingly, assuming Joseph violated a securities law, Defendants did not violate the Securities Act Section 17(a), Exchange Act Sections 10(b) and 15(c)(1)(A), and Rule 10b-5.

### D.    Aiding and Abetting and Control Liability Against Defendants

The SEC's final theory of liability against Defendants is that they are secondarily liable under the aiding and abetting statute and, in respect of Pasternak, under the control liability statute. The SEC seeks to attach aiding and abetting liability against both Defendants, pursuant to Section 20(e) of the Securities Act. 15 U.S.C. § 78t(e). The SEC also seeks to attach control liability against Pasternak, pursuant to Section 20(a) of the Securities Act. 15 U.S.C. § 78t(a).

For purposes of conducting a thorough review, the Court assumes that Joseph engaged in improper trading on the forty-two alleged trades in order to determine whether Defendants are secondarily liable for Joseph's conduct.  Thus, the Court assumes the existence of the first element necessary to prove secondary liability: the existence of an underlying securities fraud.

### 1.   *Aiding and Abetting Liability*

To establish aiding and abetting liability against Defendants, the SEC must have established that Defendants acted with actual knowledge, *Johnson*, *supra*, 530 F. Supp. 2d at 332-34, and substantially participated in the wrongdoing.  *Monsen*, *supra*, 579 F.2d at 799.

The Court first concludes that Defendants did not act with actual knowledge in furthering any alleged underlying securities violation.  The Court reiterates its reasoning set forth above, in which the Court found that Defendants did not act with the requisite scienter such that they may be held primarily liable.  Importantly, the SEC presented no piece of evidence that Defendants had *actual* knowledge of Joseph's allegedly improper conduct.  In fact, the evidence suggests that Defendants' knowledge supported the belief that Joseph provided best execution, that Joseph's customers were satisfied with his trading, that Joseph was not the only sales trader to earn higher-than-average sales credits, and that Knight's compliance and legal department were fully capable of and efficient at reviewing trades for any violation of a securities law or regulatory rule or regulation.  Moreover, Defendants' knowledge of Joseph's profits or sales credits could not have raised a "red flag" that Joseph earned those profits or sales credits through improper means.  The totality of the evidence, rather, establishes that Defendants' knowledge of Joseph's profitability indicated that Joseph was an able trader in the context of a volatile market and in the context of Knight's business model.

-94-

The Court also finds that the SEC has not proven by a preponderance of the evidence that Defendants substantially participated in the underlying violation, as it is envisioned in Section 20(e) of the Securities Act. As noted above, and in accordance with case law, the Court considers various factors to find "[s]ome link" between the underlying violation and Defendants' actions. *Rubin*, *supra*, 701 F. Supp. at 1048 (internal quotation marks omitted). In its analysis, the Court considers: (1) the amount of assistance given by Defendants; (2) Defendants' presence or absence at the time of the violation; (3) Defendants' relationship to the primary violator; and (4) Defendants' state of mind. *Ibid.* The Court also considers whether Defendants failed to act with the intention to further the underlying violation or consciously failed to fulfill a duty to act. *Monsen*, *supra*, 579 F.2d at 800.

Applying the proper legal framework, the Court concludes that neither John nor Pasternak substantially aided in any underlying securities violation. First, no proof indicates that Defendants furthered any improper trading activity. Rather, the record clearly reflects that both John and Pasternak required sales traders to properly complete order tickets and execute trades and to follow all compliance policies and procedures. Second, the physical presence of Defendants on the sales trading floor tends to prove that Defendants served as diligent supervisors, an effort that would hinder, rather than facilitate, improper practices. In addition, the Court notes that Defendants were not the only supervisory personnel present on Knight's sales trading floor; in fact, compliance personnel had desks on the sales floor and oversaw the trading activity as it occurred. Third, as stated above, John's familial and economic relationship with Joseph did not further any fraud; nor did Pasternak's ability to benefit from Joseph's profitability through a management bonus pool.

Finally, the Court emphasizes that the overwhelming evidence suggests that Defendants at all times sought to require Knight's sales traders to act in compliance with industry standards, securities laws, rules, regulations, and Knight's procedures and policies.  Defendants, therefore, did not substantially participate in an underlying securities fraud.  Defendants are not secondarily liable for Joseph's allegedly improper conduct under Section 20(e) of the Securities Act.

### 2.  *Control Liability*

The SEC's final attempt to hold Pasternak liable is via Section 20(a) of the Securities Act.  The SEC claims that Pasternak is liable for Joseph's alleged-improper conduct because Pasternak, at all relevant times, was a "control person" within the meaning of Section 20(a).  As previously discussed, to impose control liability on Pasternak, the SEC must have proven by a preponderance of the evidence that: (1) Pasternak was a "controlling person;" (2) Joseph, the controlled person, violated a securities law; (3) Pasternak was a "culpable participant" in Joseph's fraud, by directly or indirectly inducing Joseph's fraudulent conduct; and (4) Pasternak did not act in good faith.  *See Rochez Bros.*, *supra*, 527 F.2d at 890-91.

Although the Court has held that Joseph did not violate a securities law, the Court assumes, once again for review purposes, that the SEC did establish the second requisite element: that Joseph violated a securities law.  Nevertheless, the Court finds that the SEC has failed to prove the existence of the third and fourth elements: that Pasternak was a "culpable participant," not acting in good faith.

Pasternak did not directly or indirectly participate in Joseph's fraudulent conduct.  The SEC argues that Pasternak participated in Joseph's improper trading practices by: (1) failing to act when Hewitt raised concerns about Joseph's profits; (2) benefitting from Joseph's improper

trading via the management bonus pool; and (3) maintaining an active market making account, #

1002, through which Joseph executed some of his trades.  The Court rejects these arguments.

First, the Court underscores that Pasternak did act when Hewitt raised his concerns.

Pasternak undertook an in-depth review of the trades proffered by Stellato and consulted with

Knight's legal and compliance departments.  Second, mere inaction alone cannot form the basis

of liability.  *Rochez Bros.*, *supra*, 527 F.2d at 890.  Thus, Pasternak's receipt of a portion of

Joseph's profits is insufficient to rise to any level of participation.

Finally, although Pasternak's name was associated with market making account # 1002,

no evidence suggests that Pasternak executed any of the forty-two allegedly fraudulent trades.

Rather, Pasternak averred that he did not execute trades for Joseph's orders in 1999 and 2000.

At best, Pasternak's maintenance of the market making account may be seen as indirect

participation.  However, that indirect participation hardly "induced" Joseph's fraudulent conduct.

*See id.* at 890-91.  Thus, the Court concludes that the SEC has not shown that Pasternak was a

"culpable participant" in Joseph's fraud, by directly or indirectly inducing Joseph's fraudulent

conduct.

Moreover, the SEC has not shown that Pasternak did not act in good faith.  Section 20(a)

permits an affirmative defense of good faith.  *Carpenter*, *supra*, 594 F.2d at 394.  Thus, even if

the SEC had shown that Pasternak was a culpable participant, Pasternak is not liable if the

evidence proves that he took precautionary measures by diligently maintaining an adequate

system of internal control.  *Ibid.*; *First Jersey Sec.*, *supra*, 101 F.3d at 1473.  The overwhelming

evidence presented at trial establishes that Pasternak did take numerous precautionary measures

to prevent a securities violation and maintained a more-than-adequate system of internal control.

Knight utilized an extensive system of supervisors and compliance procedures.  It maintained compliance protocols imposed upon its sales traders to ensure compliance with securities laws, rules, and regulations.  Further, the compliance department, consisting of knowledgeable and capable personnel, implemented extensive review structures, such as electronic monitoring and controls, and required its personnel to be present on both the sales desk and the market making desk.  No evidence presented at trial tends to indicate in any manner that this system of supervision and compliance was inadequate.

Furthermore, Pasternak was known at Knight as being "overly-compliant."  Pasternak supported the compliance department and sought to impose procedures and policies more stringent than required by any rule or regulation.  Pasternak, in his supervisory role, performed regular spot-checks and reviewed trade runs.  In addition, when presented with the issue of Joseph's profits, Pasternak quickly notified Knight's legal and compliance departments, via Dorsey and Amoruso, and Knight's Board of Directors.  He then conducted an independent review of the trade run data presented by Stellato.  After considering all of the evidence presented to him, Pasternak aptly relied on the conclusions of Dorsey, Amoruso, and the Board of Directors that Joseph was not engaged in any improper conduct and that no disclosure of profits was required.  Pasternak was reasonable in believing that Knight's legal and compliance departments would be able to ascertain if Joseph traded in an improper manner.  In addition, Pasternak was reasonable in leaving the resolution of any issue regarding Joseph's trading practices to Joseph's direct supervisors, including Hewitt and Stellato.

The preponderance of the evidence, therefore, proves that, at all relevant times, Pasternak acted in good faith in supervising Joseph.  He maintained an adequate and diligent system of

controls, and he cannot be held strictly liable for the conduct deemed improper by the SEC.  *See*

*Carpenter*, *supra*, 594 F.2d at 394 (finding duty to supervise "does not create absolute liability

for every violation of the securities laws committed by a supervised individual").  The Court,

thus, concludes that the SEC has failed to establish control liability against Pasternak, pursuant to

Section 20(a) of the Securities Act.

**V.     CONCLUSION**

After presiding over a fifteen-day trial, during which the Court heard the testimony of

twenty-four witnesses and accepted into evidence 273 documents, the Court holds that the SEC

failed to prove by a preponderance of the evidence that Defendants violated any provision of the

Securities Act or the Exchange Act.  Rather, the overwhelming evidence indicates that

Defendants, Joseph Leighton, and Knight did nothing improper in executing the forty-two trades

singled out by the SEC.  By all accounts, the propriety of the methodology employed to earn

profits on not-held institutional orders is gauged by a facts and circumstances analysis, requiring

a trade-by-trade review.  In this instance, the SEC failed to proffer a scintilla of evidence as to the

facts and circumstances surrounding at least thirty-nine of the complained-of trades.

Furthermore, the Court rejects the SEC's attempt to make an unregulated act of earning profits a

securities fraud.

Throughout the trial, although given ample opportunity, the SEC failed to solidify its

theory of the case, or present sufficient evidence to establish any element required by the various

statutes it invokes in its Amended Complaint.  The Court, therefore, finds in favor of Defendants

and against the SEC.

Because the Court adjudicates the entirety of the case on its merits, it dismisses as moot

Defendants' motions for judgment on partial findings.  An appropriate order accompanies this

Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated:  June 24, 2008